Ada S. KERN, Plaintiff–Appellee,

v.

LEVOLOR LORENTZEN, INC., Defendant–Appellant.

No. 87–6689.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1989.

Decided March 9, 1990.

Robert H. Brown, Laner, Muchin, Dombrow and Becker, Chicago, Ill., for defendant-appellant.

Carrie MacMillin, Newport Beach, Cal., for plaintiff-appellee.

Before FLETCHER and KOZINSKI, Circuit Judges, and LEGGE,* District Judge.

FLETCHER, Circuit Judge:

Levolor Lorentzen, Inc. ("Levolor") appeals from an adverse judgment in favor of plaintiff-appellee Ada Kern. Kern obtained a general verdict against Levolor on claims of wrongful termination, breach of the implied covenant of good faith and fair dealing, and age discrimination. Kern's claims all arise under California law; jurisdiction is based on diversity. Levolor argues several grounds for reversal: (1) the district court's refusal to grant it judgment notwithstanding the verdict; (2) the district court's failure to order a new trial on the ground that the verdict and damages were against the manifest weight of the evidence; (3) judicial misconduct; (4) evidentiary error; and (5) error in the jury instructions. We find none of Levolor's arguments meritorious and affirm the judgment of the district court.

FACTS

Kern was employed by Levolor to make wands for window blinds. [R.T. 7/27 at 37]. She began her employment in 1979, and was discharged on February 4, 1985, when she was 59 years old. [R.T. 7/27 at 37, 40]. Levolor employed three wandmakers, one on each shift. [R.T. 7/28 at 35]. Kern worked the third shift. [R.T. 7/27 at 37]. All three wandmakers were over 40 years old. [R.T. 7/29 at 50]. All had received the highest possible employee rating at Levolor ("AAA"). [R.T. 7/28 at 39; S.E.R. 1]. Of the three, Kern had the least seniority. [R.T. 7/28 at 45].

In late 1984 or early 1985, because of a slowdown in orders for window blinds, Levolor decided to reduce its work force. [R.T. 7/28 at 39]. Management held meetings with employees to discuss the possibility of layoffs. [R.T. 7/28 at 41]. Levolor intended to meet with all employees who might be subject to this layoff. [Id. at 42].

However, Kern was never informed about these meetings or about the possibility of layoff. [R.T. 7/27 at 97].

Employees were rated with a "golf score" to determine who would be laid off. [R.T. 7/28 at 41]. This score was based on employee rating, production and attendance. [S.E.R. 55–66]. The employees with the highest scores in each department were to be laid off first. [S.E.R. 55; R.T. 7/28 at 45–46]. Kern was not rated. [R.T. 7/28 at 45]. Levolor contends that Kern was not given a golf score because she was the only member of her department on the third shift. [Id.] However, Levolor did rate other employees who were the only people in their department. At trial, Levolor could not explain this disparity in treatment. [Id. at 103–04]. Although Levolor purported to compare golf scores only within departments, [Id. at 47–48], it did transfer two people between job classifications during the layoff. [Id. at 48].

Levolor had an express, written policy of laying off AAA-rated employees last. [S.E.R. 32]. Three other AAA-rated employees besides Kern were laid off in February. [S.E.R. 70]. These three employees all were laid off voluntarily [Id.]; Kern, by contrast, was not given the opportunity to take voluntary layoff. [R.T. 7/27 at 97]. Although Kern had the least seniority of the three wandmakers, Levolor's own Employee Handbook stated that seniority would not be a determinative factor in layoff decisions. [S.E.R. 32]. In addition, trial exhibits indicated that layoff decisions, in fact, were made solely on the basis of the employee's grade ("AAA", "AA", etc.), production, and attendance. [S.E.R. 55–66].

On February 4, 1985, Levolor laid off several employees, including Kern. [S.E.R. 70]. As Levolor's orders again increased, it began recalling the workers. [R.T. 7/28 at 53–54]. By May 3, 1985, the plant was again operating at essentially the same capacity as before the layoffs. [R.T. 7/29 at 70]. During the summer, Levolor hired

* Honorable Charles A. Legge, United States District Judge for the Northern District of California, sitting by designation.

several temporary employees to perform odd jobs, including wandmaking on third shift. [R.T. 7/28 at 59]. Levolor also advertised for unskilled workers. [S.E.R. 74–75]. However, although most or all of the other employees laid off in February were recalled by June 5, 1985, Kern was not. [R.T. 7/29 at 70; 7/28 at 110]. Before her layoff, Kern had been given a positive rating for "adaptability", [R.T. 7/27 at 59–60], and had performed various tasks besides wandmaking on an as-needed basis. [Id. at 65]. Nevertheless, Levolor did not offer to recall Kern to work in some position other than wandmaker.

In June 1985, Kern received a letter from the Levolor profit-sharing office notifying her that she had been "terminated" as of February 4, 1985. [S.E.R. 72]. She telephoned Levolor to determine her status, and was told she was on layoff. [R.T. 7/27 at 114]. However, the plant manager never responded to her written inquiry about her job status. [Id. at 114–15].

Meanwhile, Kern looked for work but was unable to find any. [R.T. 6/30 at 28]. She stopped her job search when she developed a skin rash and a nervous problem. [R.T. 7/27 at 113]. In September, 1985, she moved with her husband to Ohio to live with their children. [R.T. 7/27 at 29]. On October 18, 1985, Levolor sent Kern a brief letter stating that they had a job opening to discuss with her. [S.E.R. at 79]. By this time, Kern had already filed a complaint with the EEOC. [R.T. 7/27 at 115]. Levolor admitted that it intended to employ Kern in cutting an entirely new piece, called a "vogue valance", in addition to performing her old job as wandmaker. [R.T. 7/28 at 54].

Levolor asserted that Kern was chosen for layoff because she had the least seniority and lowest production among the three wandmakers, and that the layoff was consistent with Levolor's contractual obligations to Kern. Kern asserted that Levolor had a contractual obligation to lay off AAA-rated employees last, that it failed to follow its own procedures in marking her for layoff, and that she was the victim of age discrimination.

The case was tried to a jury which found in favor of Kern and assessed damages of $237,000. The district court ordered a remittitur and entered judgment for Kern in the amount of $137,000. The district court declined to award attorney's fees. [R.T. 10/01 at 5]. The district court had jurisdiction under 28 U.S.C. § 1332 (diversity); we have jurisdiction under 28 U.S.C. § 1291. The Notice of Appeal was timely filed. This case primarily requires us to determine whether the evidence is sufficient to support the jury's verdict. Our review is narrow and limited.

## I.

## JUDGMENT NOTWITHSTANDING THE VERDICT

Jury verdicts are due considerable deference. In reviewing the district court's denial of JNOV, we apply the same standard as the district court. We may reverse the district court only if we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict. The verdict must be affirmed if supported by substantial evidence. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1982).

### A. *Wrongful Termination*

Levolor contends that Kern failed to produce evidence that it breached an implied-in-fact employment contract. This argument has two parts: first, Levolor argues there was no contract, i.e., that Kern could be discharged at will; second, Levolor argues that even if there was a contract, it was not breached.

### 1. *Existence of a Contract*

California provides by statute that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." Cal. Labor Code § 2922. Nevertheless, judicial decisions by California courts have estab-

lished beyond cavil that an employer's course of conduct can create implied-in-fact contractual terms of employment, including a covenant not to discharge an employee except for good cause or to discharge an employee only under certain conditions. *See Pugh v. See's Candies, Inc.*, 116 Cal. App.3d 311, 171 Cal.Rptr. 917 (1981); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 222, 765 P.2d 373, 383–84 (1988). The existence of such implied promises is a question of fact for the jury to decide. *Foley*, 254 Cal.Rptr. at 223, 765 P.2d at 384–85. In determining whether such promises exist, the jury must look to the entire relationship of the parties. *Id.* at 224, 765 P.2d at 385. Factors include, but are not limited to, the terms of the employment manual, the employer's personnel policies or practices, the longevity of plaintiff's service, acts or communications by the employer reflecting assurances of continued employment, and whether plaintiff has received consistent promotions or salary increases. *Id.* at 225, 765 P.2d at 386.[1]

■ Although the evidence of an employment contract was not overwhelming, it was adequate to allow the issue to go to the jury. There was evidence that Levolor had a policy of laying off "AAA" employees last; that Kern was "AAA" rated; that Levolor had a policy of rating each employee before deciding on layoffs; and that Kern was not given a rating. Trial exhibits indicated that layoff decisions were based solely on the employee's "grade" (AAA, A, B, etc.), "average" (production) and "points" (attendance). Seniority was not a determinative factor, either in the ratings actually made or as indicated by the Employee Handbook.

The evidence in favor of Levolor does not compel upsetting the jury's verdict. The jury could have concluded from the evi-

dence that Levolor had impliedly promised Kern that she would be treated fairly and would not be laid off except in accordance with the policies stated in the Employee Handbook and by the procedures applied equally to all employees. Although the Handbook states explicitly that it "is not a contract of employment," Kern does not rely exclusively on the Handbook nor argue that an express contract is embodied in the Handbook. Instead, Kern argued that an implied contract existed, proved in part by the Handbook but more importantly, by the actual personnel policies and practices of Levolor.

### 2. Breach of Contract

Levolor argues that even if it had a contract with Kern, it was not breached. It bases this argument on evidence tending to show that Kern was laid off for the legitimate business reason of a reduction in force due to economic conditions. *See Malmstrom v. Kaiser Aluminum and Chemical*, 187 Cal.App.3d 299, 231 Cal. Rptr. 820 (1986). However, there was evidence that even if Kern was laid off in order to reduce the workforce, Levolor nevertheless laid her off in violation of its express and implied promises to follow certain procedures and hierarchies in determining which employees would be laid off first. Especially probative was evidence that Kern was the *only* "AAA" employee involuntarily laid off at that time; that she was not included in meetings to discuss layoffs; that she was never given a "golf score," which Levolor used to determine layoffs; that Levolor based its decision in part on Kern's lack of seniority, although seniority was not a factor in ranking other employees; and that Levolor did not consider transferring Kern to a different department, although other employees were

---

1. The dissent attacks these decisions as contrary to the legislative will. However, it is not the prerogative of this court to ignore or overrule decisions of the California courts interpreting California statutes. The majority accordingly declines to address the dissent's argument that these precedents were wrongly decided. We do note, however, that the predictability of legal outcomes is hardly thrown in doubt by the majority decision, as the dissent suggests. The legal rules relied upon by the majority in this case are readily ascertainable by any competent attorney performing adequate research. "Adequate research" necessarily entails inquiring into how a relevant statute has been interpreted by the courts, as well as determining whether common law rules supplement statutory provisions.

transferred rather than laid off. This evidence was sufficient to support a verdict in favor of Kern.

## B. *Good Faith and Fair Dealing*

██ Under California law, *every* contract includes a covenant of good faith and fair dealing, which requires that neither party "do anything which will deprive the other of the benefits of the agreement." *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 206 Cal. Rptr. 354, 362, 686 P.2d 1158, 1166 (1984). The covenant requires cooperation in carrying out the contract and honesty in creating or settling disputes. *See* 1 Witkin, *Summary of California Law* 674–76 (9th ed. 1987). In the employment setting, a breach can be shown "where the employee can establish lengthy satisfactory service and that the employer acted contrary to its own policies in discharging the employee." *See Sorosky v. Burroughs Corp.*, 826 F.2d 794, 802 (9th Cir.1987) (construing California law). There was sufficient evidence to allow this issue to be decided by the jury.

## C. *Age Discrimination*

Levolor argues that Kern failed to establish a prima facie case of age discrimination. It appears from our review of the transcript that no, or virtually no, evidence was presented tending to show that Levolor treated Kern as it did because of her age. We do not, however, deem it necessary to resolve this question because the verdict is supported by the contractual claims discussed above.

## D. *General Verdict*

██ As a general rule, "a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury." *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986); *see also Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*,

370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962). However, we may construe a general verdict as attributable to one of several theories if it was supported by substantial evidence and was submitted to the jury free from error. *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir.1980).[2] The factors we must consider in deciding whether to exercise this discretion are: (1) the potential for confusion of the jury; (2) whether the losing party's defenses apply to the count upon which the verdict is being sustained; (3) the strength of the evidence supporting the count relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to the various legal theories. *Id.* at 938–39.

██ We find this an appropriate case for the exercise of discretion. There was little potential for confusion. Kern's counsel stressed the contractual bases for recovery in her closing argument. Age discrimination was offered not as an independent ground for recovery, but only as a possible explanation for Levolor's disparate treatment of Kern. [R.T. 7/29 at 146–48.] The same factual predicate—that Kern was, without adequate explanation treated differently from other employees—necessary to find age discrimination would support a verdict in favor of Kern on her contractual theories. *See Traver*, 627 F.2d at 939 (no need to reach sufficiency of evidence for weak section 1983 claim where that claim "all but derivative" of state tort claims); *see also Roberts v. College of the Desert*, 870 F.2d 1411, 1417 (9th Cir.1988) (no need to reach sufficiency of evidence on discrimination theory in employment dispute where there was sufficient evidence of due process violation). Levolor's defenses were the same for both the contractual and age discrimination claims: it argued that Kern was treated in accordance with company policy and was discharged for a legitimate business reason. The jury could not have found in favor of Kern under any of her theories without rejecting these defenses.

---

**2.** The dissent attacks the *Traver* decision as contrary to century-old Supreme Court authority. We disagree, but even if true it is not for this panel to decide. The dissent would have us overturn not only decisions of the Supreme Court of California but of our own court as well. We decline the invitation.

The evidence supporting the contractual theories of recovery, while not overwhelming, was strong. The facts used by Kern to support her theories of recovery were largely identical, except that her claim of age discrimination required additional evidence to support Kern's theory of Levolor's motive. The same facts that bore on the circumstances of her discharge were relevant to each of her theories.

## II.

### WEIGHT OF THE EVIDENCE

■ Levolor argues that, even if JNOV would not have been proper, the district court should at least have ordered a new trial on the ground that the verdicts on liability and damages were against the manifest weight of the evidence. This is a discretionary action on the part of the district court. *William Inglis*, 668 F.2d at 1027.

Levolor's argument that the district court abused its discretion in denying it a new trial on the issue of liability hinges, of course, on the same evidentiary arguments discussed above. On Kern's contractual claims, refusal to grant a new trial was not an abuse of discretion. The contractual claims being adequate to support the judgment, the age discrimination claims need not be discussed.

Levolor makes a distinct challenge to the amount of damages. The jury originally returned a verdict in favor of Kern for $237,000. The district court considered this amount "outrageous" and "weird", E.R. 32, and indicated its intent to grant a new trial if Kern refused to accept a remittitur. *Id.* The court initially indicated that it felt $60,000 would be an adequate amount. *Id.* After further consideration, the court proposed a remittitur resulting in a judgment of $137,000. [R.T. 10/01 at 10–13.] Kern accepted the remittitur.

The court did not abuse its discretion in calculating this remittitur. There was evidence that Kern's total economic damages through age 65, when she planned to retire, were $110,000. [Exhibit 121]. There was evidence that Kern incurred $2,500 in consequential expenses moving to Ohio. It appears that the district court erroneously included as consequential damages $6,000 in costs incurred by Kern in traveling back to California to litigate her claim. [R.T. 10/01 at 11–12.] We also doubt that damages for stress could properly be awarded as consequential damages in this case. However, we affirm the remittitur on the ground that the expert testimony on future economic conditions was necessarily speculative. The expert himself testified his calculation was conservative. [R.T. 7/27 at 88.] Therefore, it was not reversible error to award Kern somewhat more than the dollar figure the expert suggested. *See Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir.1985) (if damage award is supportable, it will not be disturbed on appeal unless grossly excessive, monstrous, or shocking to the conscience.) [3]

## III.

### MITIGATION OF DAMAGES

■ Levolor argues that Kern failed to mitigate her damages. Under California law, an employer's liability is reduced by the amount the employee earned or with reasonable diligence could have earned after her discharge. The employer bears the burden of proving that "comparable, or substantially similar," employment was available to the employee; the employee is not required to prove mitigation. *Parker v. Twentieth Century–Fox Film Corp.*, 3 Cal.3d 176, 181–82, 89 Cal.Rptr. 737, 740, 474 P.2d 689, 692 (1970). Levolor failed to carry its burden. By contrast, Kern testified that she looked for work regularly for six months, until physical and emotional disorders prevented further searching.

---

**3.** Contrary to the dissent's characterization of our holding, we do not approve damage calculations that are clearly erroneous. Levolor did not demonstrate clear error in the economic expert's calculations. Although the district court did not rely entirely on permissible considerations, we may affirm the district court on any basis with support in the record. *Leidholdt v. L.F.P., Inc.*, 860 F.2d 890, 895 (9th Cir.1988).

[R.T. 6/30 at 27–28; R.T. 7/27/87 at 112–13.] Although Levolor asserts that it offered Kern her job back, it did not in fact do so: it merely indicated its desire to discuss a job opening with her. [S.E.R. 79.] This invitation came after Kern had moved to Ohio.[4] The court did not clearly err in concluding that Levolor had failed to prove that Kern did not adequately mitigate her damages.

## IV.

## JUDICIAL MISCONDUCT

The district court judge made various comments which Levolor asserts damaged its case. These were as follows:

1. First, in a colloquy over an evidentiary motion, discussing the relevance of Levolor's evidence that other individuals over 50 years of age were not laid off, to disprove age discrimination, the following exchange took place:

The Court: Sure. They got preferential treatment somehow.

Mr. Brown [for Levolor]: So there's no age discrimination.

The Court: There is age discrimination. They discriminated against this lady and didn't layoff the others.

Mr. Brown: Your Honor, I differ on that.

The Court: I know you do. But you differ on everything. You know, you come from Chicago, don't you?

Mr. Brown: I do.

The Court: Yeah, contentious Chicago. Come on.

[E.R. 26.] This exchange occurred in front of the jury.

2. Levolor also objects to the district court's comments during Levolor's examination of a witness:

Q: Could you tell us what that figure [rate of production] means?

A: She worked 143 days for an hour more and I took the 143 days and divided the number of hours that she had written that she had worked into that 143. And then it was multiplied by 7.5, which is the hours that she had worked, which is the hours for the whole day, and it came out to 28.8 wands per day.

The Court: What on earth has that got—that's time, not rate of production.

Mr. Brown: Let me follow up because I think—

The Court: So idiotic.

Mr. Brown: Leslie just forgot to tell us one thing.

The Court: I'm getting sick of it. If you don't start getting on something else I may sanction you by issuing a judgment in the favor of the plaintiff. I'm getting sick of it.

[E.R. 23].

3. Finally, during examination of a witness concerning the meaning of "termination" and "layoff," the court instructed the jury that the terms "layoff", "discharge", "quitting", and "termination" all have different meanings, as a matter of law. [E.R. 16, 17, 24.] Levolor objected. [E.R. 16.] Levolor argues that this instruction was crucial because Kern argued that her "termination" by Levolor was key evidence of Levolor's breach. However, any possible prejudice to Levolor was offset by the court's instruction to the jury that "[Kern] was not terminated for layoff. She was laid off." [E.R. 17.]

Levolor does not allege that it moved for a mistrial based on Judge Hauk's misconduct. Levolor did, however, move for a new trial. Levolor objected to the court's remarks concerning age discrimination and the "layoff/termination" distinction.

Litigants are entitled to a judge who is detached, fair and impartial. *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d

---

4. The dissent mistakenly asserts that Levolor's letter was an "offer" of employment despite the fact the letter used the words, "We have a job opening at this time that [we] would like to *discuss* with you." (Emphasis added.) Recognizing the weakness of its position, the dissent argues that the letter imposed a duty on Kern to respond. California law requires only that an employee respond to an *offer* of employment, not an *invitation to discuss* employment. Levolor's invitation came after Kern had moved to Ohio after her six month's fruitless search for employment in California and after Levolor had "terminated" her. Kern had no obligation to return to California for a "discussion" about employment.

525, 531 (9th Cir.1986). The standard for reversal on the basis of judicial misconduct in a civil trial is, nevertheless, quite high. Comments by the judge require reversal if the judge expresses his opinion on an ultimate issue of fact in front of the jury or argues for one of the parties. *Id.* Reversal will not be required where the judge emphasizes evidence; nor where the judge expresses skepticism, provided that the witness has an opportunity to respond. *Id.* Cutting comments to counsel, particularly those relating to skill rather than good faith or integrity, will not generally mandate reversal. *Id.*

The difference between comments which mandate reversal and comments which do not is demonstrated by *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir.1980) and *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 469–71 (9th Cir.1977). In *Maheu*, plaintiff was suing for libel. Thus, his character was hotly in issue. At the end of the jury instructions, the judge discussed the plaintiff's credibility and character in a manner which we deemed a judicial comment on character, virtually directing a verdict for plaintiff despite considerable impugning evidence. The judge's comments were found to be reversible error.

In *Ward,* the judge demeaned the quality and relevance of much of plaintiff's evidence and suggested nondiscriminatory motivations the defendant might have had: The judge seldom spoke directly to ultimate issues, and cautioned the jury that his remarks were not evidence. We declined to reverse. In reaching our conclusion we did not, however, focus primarily on the nature of the remarks: the most important factor in our decision to affirm was our perception that plaintiff's case was too weak for the comments to have prejudiced it.

Even taking all of the district court's comments together, we conclude there was no reversible error in this case. Levolor has failed to explain how the court's comments about "layoff" and "termination" prejudiced its case. The judge's occasional commentary on Chicago lawyers and on the flaws in Levolor's witnesses' testimony did not go to the merits. Upon our review of the trial as a whole, we cannot say that the district court judge appeared to favor one side over the other by his comments.

The judge's comments about age discrimination, taken out of context, could be misunderstood. However, the context of the comments makes it clear that the judge was simply explaining his evidentiary ruling: that evidence that other workers had not been laid off did not mean that Kern was not discriminated against. In light of the adequate evidence to support the verdict on the contractual theory, we conclude that Levolor was not prejudiced by this remark.

## V.

## EVIDENTIARY ERROR

Evidentiary rulings are reviewed for abuse of discretion. *Coursen v. A.H. Robins,* 764 F.2d 1329, 1333 (9th Cir.1984). Error mandates reversal only if it probably affected the verdict. *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir.1983).

■ Levolor assigns error to two rulings. First, it argues that the court improperly excluded as irrelevant testimony from a Levolor employee who had trained Kern. That employee would have testified about the skills required for other jobs at Levolor. However, the witness had already testified that, in her opinion, Kern was not qualified for any other job at Levolor. [E.R. 29]. The court was within its discretion in determining that nothing more would be gained from a detailed description of numerous other jobs at Levolor.

■ Levolor also challenges the exclusion of testimony from its Corporate Manager of Personnel. This testimony, according to Levolor, would have explained the "profit sharing letter" Kern received, which contained the word "terminated". [R.T. 7/29 at 88–89.] This testimony was properly excluded on grounds of competency. Levolor's witness did not hold a position with Levolor until after the relevant time period, and therefore lacked personal knowledge concerning the interpretation of

a letter Kern received before the witness became affiliated with the company.

## VI.

## JURY INSTRUCTIONS

■ A district court's formulation of jury instructions is reviewed for an abuse of discretion, so long as its statement of the law is correct. *United States v. Wellington,* 754 F.2d 1457, 1463 (9th Cir.1985). Error will not require reversal if it is more probably than not harmless. *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983).

Levolor asserts that the district court should have given its proposed instruction on mitigation of damages, which stated that Kern would not be entitled to damages after failure to accept a substantially equivalent job from Levolor or after she dropped out of the job market. [E.R. 35 (proposed instruction); 14–15 (rejection of proposed instruction)]. Instead, the court gave the following instruction:

> An employee who was damaged as a result of a breach of an employment contract by the employer, has a duty to take steps to minimize the loss by making a reasonable effort to find comparable employment.
>
> If the employee through reasonable efforts could have found comparable employment, any amount that the employee could reasonably have earned by obtaining comparable employment through reasonable efforts shall be deducted from the amount of damages awarded to employee.

[S.E.R. 131]. This is a correct statement of California law. *See Parker v. Twentieth Century–Fox Film Corp.,* 3 Cal.3d 176, 89 Cal.Rptr. 737, 740, 474 P.2d 689, 692 (1970). There was no error in giving the instruction. Levolor's proposed instruction, by contrast, was misleading because there was no evidence that Levolor had actually offered Kern her job back.

## CONCLUSION

There was substantial evidence to support the verdict and judgment on Kern's contractual claims. The award of damages was not clearly erroneous. Comments by the district court judge were not prejudicial to Levolor. The evidentiary rulings were not error. The jury instruction on mitigation was an accurate statement of the law. The judgment is AFFIRMED.

KOZINSKI, Circuit Judge, dissenting:

"The prophecies of what the courts will do in fact ... are what I mean by the law," wrote Justice Holmes almost a century ago. O.W. Holmes, *The Path of the Law,* 10 Harv L Rev 457, 461 (1897). According to Holmes, the business of lawyers is the prediction of when and how the coercive power of the state will affect people's lives:

> People want to know under what circumstances and how far they will run the risk of coming against what is so much stronger than themselves, and hence it becomes a business to find out when this danger is to be feared. The object of our study, then, is prediction, the prediction of the incidence of the public force through the instrumentality of the courts....
>
> ... It is to make the prophecies easier to be remembered and to be understood that the teachings of the decisions of the past are put into general propositions and gathered into text-books, or that statutes are passed in a general form.

*Id.* at 457–58.

But lawyers can only give clients reliable advice to the extent courts in fact do as they say. When courts overlook, stretch, riddle with exceptions or ignore legal principles, prediction becomes difficult. Indeed, it is a commonplace among lawyers that even a fool-proof case can be lost once it gets into court.

This is such a case. By all rights, Levolor Lorentzen should have won before the jury, failing that, been granted a jnov by the district court and, as a last resort, had the verdict summarily reversed on appeal. The majority reaches the contrary conclusion only by ignoring or misconstruing important legal principles and finding factual support for the verdict where there is none. First, the majority disregards the presump-

tion embodied in California Labor Code § 2922, which provides that, unless the parties indicate otherwise, an employment for an indefinite term is an employment at will. Section 2922 mandates that, to win at trial, plaintiff-employees must prove that there was an employment contract. Here the plaintiff dragged Levolor into court and presented nothing more than unsubstantiated assertions that there was an implied contract of employment. In response, Levolor demonstrated that it told its employees in no uncertain terms that it did not intend to create a contract, and that it at all times followed company policies. The majority nonetheless upholds a jury verdict against Levolor for breach of an employment contract. What earthly good then is the statutory presumption?

The majority also manages to override sub silentio a procedural rule four times stated by the United States Supreme Court in unequivocal terms and followed just as unequivocally by almost every other circuit. A general verdict that may have been based on any of several theories of liability is normally impossible to dissect. When there is insufficient evidence to support one legal theory, therefore, the entire verdict must be reversed. Purporting to apply a very narrow exception to this rule, the majority finds that in a case where plaintiff's legal theories are closely related, where evidence to support one of the theories is nonexistent, where evidence to support the other theories is exceptionally weak, and where the judge substantially interferes with the jury's function by expressing his own view on ultimate issues, the evidence is sufficient to support a general verdict of liability. So much for stare decisis.

Finally, the majority upholds an excessive damage award by ignoring relevant law on a plaintiff's duty to mitigate. It is hornbook law that a discharged employee has a duty to mitigate damages by seeking other employment through the exercise of reasonable diligence. The measure of recovery must be reduced by any amount the employee has earned, or with reasonable diligence might have earned, since the discharge. Moreover, liability for wrongful discharge ends when an employee is of-fered her old job back. Here it is uncontroverted that Ada Kern stopped looking for work shortly after her layoff. It is also uncontroverted that, several months after the layoff, Levolor attempted to offer Kern her job back. In the face of all this, the majority upholds a damage award based on several years of lost wages. Here the court doesn't rely on exceptions; it simply affirms the district court's apparent conclusion that Ada Kern had adequately mitigated damages. But are we potted plants? If we're going to affirm the district court when its actions are plainly contrary to the facts and the law, why bother with appellate review?

Admittedly, this is not a very important case; it is a garden variety employment dispute, much like thousands of others litigated in the courts every year. The verdict, $137,000, is hardly astronomical by current standards, and the plaintiff, Ada Kern, surely needs the money much more than the defendant, a large, multi-state corporation. But the simple fact remains that, when the law is fairly applied to the record, Levolor is entitled to keep the money. We have a responsibility to so hold.

## I. Breach of Contract/Good Faith and Fair Dealing

In order to collect from Levolor, Ada Kern must prove that an employment contract existed, that Levolor breached the contract and that she suffered injury as a result. See *Otworth v. Southern Pacific Transportation Co.*, 166 Cal.App.3d 452, 458, 212 Cal.Rptr. 743 (1985). The record contains insufficient evidence to go to the jury on any one of these questions.

### A. Existence of a Contract

1. The law in California is clear: "An employment, having no specified term, may be terminated at the will of either party on notice to the other." Cal Labor Code § 2922 (West 1989). The California Supreme Court recently confirmed that section 2922 establishes a presumption of at-will employment if the parties have made no agreement specifying the length of em-

ployment or grounds for termination. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 677, 254 Cal.Rptr. 211, 765 P.2d 373 (1988). Section 2922 reflects a legislative judgment that employers and employees are not bound to their employment relationship unless they take affirmative steps to provide otherwise.

In 1872, California became the first state to create a statutory presumption of at-will employment, with the enactment of the predecessor to section 2922. See Lawrence C. Levine, *Judicial Backpedaling: Putting the Brakes on California's Law of Wrongful Termination*, 20 Pacific L.J. 993, 994 & n. 5 (1989). For a century, the California courts applied the law as one might expect: Unless one of the parties could show some express agreement to the contrary, the relationship was deemed terminable at will. See, for example, *Union Labor Hospital Association v. Vance Redwood Lumber Company*, 158 Cal. 551, 554, 112 P. 886 (1910); *Patterson v. Philco Corp.*, 252 Cal.App.2d 63, 65–66, 60 Cal. Rptr. 110 (1967). See also Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816, 1825–26 (1980).

As of late, without any relevant amendment of the statutory language, the courts have found more and more situations where the presumption of at-will employment has been overcome by a nod, a wink, a smile or a stray comment. See, for example, *Pugh v. See's Candies, Inc.*, 116 Cal.App.3d 311, 329, 171 Cal.Rptr. 917 (1981); *Wayte v. Rollins International, Inc.*, 169 Cal.App.3d 1, 18, 215 Cal.Rptr. 59 (1985); *Robinson v. Hewlett–Packard Corp.*, 183 Cal.App.3d 1108, 1122–23, 228 Cal.Rptr. 591 (1986); *Harlan v. Sohio Petroleum Co.*, 677 F.Supp. 1021, 1030 (N.D. Cal.1988) (applying California law). What was once a relatively simple inquiry has become the stuff of lengthy trials and burdensome discovery, encompassing everything that ever transpired between the em-

ployee and her employer, as well as the employer's treatment of other employees. Not surprisingly, juries, and judges too, often become confused as to whether there really was anything amounting to an agreement between the parties, and natural sympathies substitute for the missing facts. The net effect is that the statutory presumption of at-will employment has been reduced to a hollow legal fiction, an inconvenience to be endured on the way to a hefty recovery.[1]

One can fairly debate the merits of at-will versus for-cause employment. Contrast Richard Epstein, *In Defense of the Contract at Will*, 51 U.Chi.L.Rev. 947 (1984), with Lawrence E. Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum.L.Rev. 1404 (1967). But the judgment is a legislative one; it should be considered, debated and enacted by the branches of government directly accountable to the public. See, for example, Mont.Code Ann. §§ 39–2–201 et seq. (1987); *Meech v. Hillhaven West, Inc.*, —— Mont. ——, 776 P.2d 488 (1989). Achieving the same result judicially not only short-circuits democratic processes, it imposes substantial collateral costs and uncertainties on everyone involved. Searching for the existence, and divining the terms, of an implied contract is a burdensome, time-consuming and uncertain proposition. The risk of an erroneous determination is greatly magnified, encouraging parties with weak positions—employers as well as employees—to spin the litigation wheel-of-fortune. Rational planning or a reasonable litigation strategy becomes very difficult as no one can tell even remotely how a case will be resolved once it gets into court. The ability to predict outcomes, which lay at the heart of Justice Holmes's model of the legal profession, is lost as a vocation; the lawyer ceases to be a forecaster and becomes a croupier.

---

1. In the words of one commentator, exceptions to the at-will doctrine have become so pervasive that nothing but "bad luck" will prevent an aggrieved employee from recovery. Robert M. Bastress, *A Synthesis and a Proposal for Reform of the Employment At–Will Doctrine*, 90 W.Va.L. Rev. 319, 319–20 (1988).

2. The majority's treatment of Levolor's claim that Ada Kern was not entitled to recover because she had failed to overcome the statutory presumption of at-will employment well illustrates the problem. Under the current state of California law, the presumption of employment at will can be overcome if one of two conditions is met:

(1) the contract was supported by consideration independent of the services to be performed by the employee for his prospective employer; or (2) the parties agreed, expressly or impliedly, that the employee could be terminated only for good cause.

*Pugh*, 116 Cal.App.3d at 326, 171 Cal.Rptr. 917 (1981), quoting *Rabago–Alvarez v. Dart Industries, Inc.*, 55 Cal.App.3d 91, 96, 127 Cal.Rptr. 222 (1976). Ada Kern does not claim that there was independent consideration for an employment contract or that she had an express agreement with anyone at Levolor that she would be discharged only for good cause or in accordance with certain procedures. Thus, Kern was required to prove that there was an implied contract between herself and Levolor. The majority notes, citing *Foley*, that evidence of such a contract may come from many sources, including an employment manual, the employer's personnel practices and policies, and longevity of service.

From this hefty record, Ada Kern culls only two pieces of evidence from which the jury might have divined a contract: (1) Levolor's policy, described in its Employee Handbook, of laying off AAA employees last; and (2) the procedure adopted by Levolor in implementing the February 1985 workforce reduction by which the company laid off employees based on ratings for grade, production and attendance, irrespective of seniority—the so-called "golf-score" analysis. These items sound good, and I can certainly understand how the majority comes to rely on them; after all, there must be *something* there or else the lawyers wouldn't be spending so much time talking about them. The fact is, however, when one examines the record carefully, neither item amounts to an agreement within the *Foley/Pugh* definition, so as to rebut the statutory presumption of at-will employment.[2]

a. The Handbook

In language even a second-grader could understand, the first page of the Levolor Employee Handbook states: "this is not a contract of employment and policies may be modified by the Company at any time." Appellee's Excerpts of the Clerk's Record (AER) at 5.[3] It is the most fundamental principle of contract law that there can be no legally enforceable obligation without a promise, a commitment to future behavior.[4] It is difficult to imagine a clearer statement that one does not intend to be legally bound by the contents of a written document than the words Levolor used here. Yet the majority relies on the manual as evidence of a contract. Majority op. at 776. I fail to see how an employment manual that states on its face that it is *not*

---

**2.** Neither Ada Kern nor the majority attempts to derive an agreement from Kern's length of employment with Levolor. Nor would they be able to. In *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980), the court found that Cleary's eighteen years of service, beginning when he was a young man and including regular promotions, coupled with the airline's express policy for adjudicating employee disputes, acted as "a form of estoppel," precluding discharge without just cause. 111 Cal.App.3d at 455–56, 168 Cal.Rptr. 722. Ada Kern began working for Levolor in 1979, at age 53. She was hired as a wandmaker. Kern worked for Levolor for less than six years, always in that same job classification. Reporter's Transcript (RT) 7/27 at 40. This is hardly a scenario that suggests an implied agreement for lifelong employment.

**3.** Ada Kern was aware of this statement. RT 7/28 at 12.

**4.** "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (1981); "No question for the law of contracts arises unless the dispute is one over a promise—a commitment to future behavior." E. Allan Farnsworth, *Contracts* § 1.1 at 5 (Little, Brown, 1982). See also Charles Fried, *Contract as Promise* 1 (Harvard, 1981) ("The promise principle ... is the moral basis of contract law").

a legally enforceable agreement, one which provides that it is subject to change by the employer at any time, can serve as any type of proof that the parties had a contract, implied or otherwise.

Cases from both California and this court recognize that an implied agreement is not enforceable where there is an explicit agreement to the contrary. See, for example, *Shapiro v. Wells Fargo Realty Advisors*, 152 Cal.App.3d 467, 199 Cal.Rptr. 613, 622 (1984); *Wal–Noon Corp. v. Hill*, 45 Cal.App.3d 605, 613, 119 Cal.Rptr. 646 (1975); *Gianaculas v. Trans World Airlines, Inc.*, 761 F.2d 1391, 1394 (9th Cir. 1985) (applying California law). In *Shapiro*, the California Court of Appeal held that an explicit disclaimer in a stock option agreement that reserved the employer's right to discharge at will could not be overridden by any implied-in-fact agreement to the contrary. 199 Cal.Rptr. at 615–16, 622. Accord, *Gianaculas*, 761 F.2d at 1394. Levolor's Employee Handbook states explicitly that Levolor is not bound by any of the policies outlined therein. Nonetheless, Ada Kern would have the court find an implied contract in this document. But she can't have it both ways: If Kern wants to rely on the Handbook, she must accept the express limitations contained therein. Under California law, a document that states explicitly that it is *not* a contract cannot be evidence of an implied contract.

b. The "golf scores"

Nor does the second item of evidence—the golf scores—provide the slightest support for finding a contractual obligation between Levolor and Ada Kern. Ada Kern was a good employee. But in the workplace, as elsewhere, everything is relative. Steven Smithling, Kern's shift supervisor at Levolor, testified without contradiction that Ada Kern was laid off because the company was experiencing a downturn in business and needed the production of only two full-time wandmakers, rather than the three they were then employing. Reporter's Transcript (RT) 7/28 at 44. All three wandmakers had AAA ratings, the highest the company gave, and excellent attendance records. Id. at 45. Unfortunately, Ada Kern's production was slightly lower than that of the other two wandmakers, and she was the least senior. Id.

In preparation for the February 1985 layoff decisions, Levolor carefully recorded relevant employee data on a series of tally sheets. AER at 55–66. The tally sheets contained two sets of scores. One was a series of absolute measures, reflecting the employee's grade (AAA, A, B, etc.), average production, and a measure of attendance. All employees eligible for layoff, including Kern, received these ratings. Id. at 64. Many of the tally sheets also contained a set of "golf scores," in which the absolute measures were converted to a relative scale; the better the employee, the lower the score, hence the analogy to golf scores. It was Steven Smithling's uncontroverted testimony that golf scores were used only to compare employees *in the same job classification in the same shift.* RT 7/28 at 45–46. They were not used to compare employees on different shifts, or employees on the same shift doing different jobs.

There was nothing magic about the golf scores; they were simply a mathematical summary of various employees' work performance, used to make layoff decisions among employees who were otherwise similarly situated. Because Ada Kern was the only wandmaker on her shift and there was no one with whom to compare her, no golf scores were prepared for her.

Based on this evidence, the majority concludes that a jury could reasonably find that Levolor had a contractual obligation to prepare golf scores for Ada Kern. I don't get it. Levolor demonstrated by uncontroverted evidence that the golf scores were inapplicable to Ada Kern. How could a rational jury conclude from this that Levolor and Ada Kern had an implied contract that she would receive such scores?

The majority relies on the fact that Levolor calculated golf scores for two other employees who were the only ones on their shift in their job classification. Majority op. at 774. But these were the exceptions, and there is no indication that the golf

scores, once computed, played any part in the decision whether to lay them off. The fact is, most employees in Ada Kern's position were treated exactly the same: they did *not* receive golf scores. See AER at 65. Under the majority's rationale, Ada Kern had an implied contract to be treated *different* than most of the other employees in her position. This just doesn't make sense.[5]

Equally significant, the record is clear that Ada Kern was not aware of the golf-score system until after her layoff. RT 7/27 at 97. Yet she claims that Levolor breached its contract with her by failing to give her a golf score before laying her off. To show that she had an implied agreement with Levolor that they would give her such a rating, however, Kern must first prove that Levolor management did or said something *to her*. *Pugh*, 116 Cal.App.3d at 326, 171 Cal.Rptr. 917. It confuses "implied" with "imaginary" to find that an employer and employee had an agreement over a policy about which the employee had absolutely no knowledge.

Where the majority finds an obligation on Levolor's part to provide golf scores is beyond me. It's not in the Employee Handbook (even assuming the Handbook could serve as a contract). It's not in any written agreement. Nor is there any evidence that Ada Kern talked to anybody about the golf scores before her layoff. What we have here is a cheap litigation trick, honed to a fine art by contingency-fee-hungry lawyers: rummage through the opposing party's files and records until you find something that looks vaguely like your

client has been afforded differential treatment, no matter how trivial or irrelevant, and then parade it before the jury as a grave injustice.[6]

To say, as the majority does, that a rational jury might find that Ada Kern had a contractual right to have Levolor perform an irrelevant, hypothetical and to her unknown tabulation on the layoff tally sheet, is so contrary to common sense it does not, in my opinion, pass the snicker test. Quite aside from the substantive problems with today's opinion, one unfortunate consequence is that lawyers will be encouraged to engage in this type of scorched-earth litigation tactic; after all, you never know what triviality might impress a court and jury. This is no doubt welcome news for lawyers, but I doubt it helps the economy or that it is in the long-term interest of employees.

## B. Breach of Contract

Even if Ada Kern could prove that Levolor had some contractual obligation to her regarding her layoff, there is no evidence that the company did anything less than what it promised. It is uncontroverted that before the layoff Levolor had three wandmakers, and after the layoff only two. Kern had the least seniority of the three wandmakers: She had five and a half years seniority at the time of her layoff; Martha Barone had seven years; Gloria Vanes had eleven and a half years. Levolor's Employee Handbook states that "seniority is considered ... in the event of a layoff." AER at 30. It also states that "[o]ur general guideline is that the least senior person will

---

**5.** The majority also sees some invidiousness in the fact that the company transferred two workers between job classifications during the layoff, but Kern was not transferred. Majority op. at 774. But the overwhelming majority of employees laid off were *not* transferred. See AER at 68. To claim the right to be transferred, Kern must again argue she was entitled to be treated different than most of her coworkers.

**6.** The majority offers yet another example of such an illusory distinction: The three other AAA employees Levolor let go in February were on voluntary layoff, while Kern was on regular layoff. Kern's lawyer stressed this discrepancy more than once before the jury. See RT 7/27 at

97; 7/29 at 66, 145. The majority also is impressed with it. See majority op. at 774, 776. But disparate treatment is, once again, not enough to establish liability; there must be a contractual right to similar treatment. Not only did Kern fail to show *any* contractual entitlement to voluntary layoff, she could not possibly do so: Most laid off employees were on involuntary layoff. See AER at 68, 70. Like all other discrepancies Kern points to, this one is entirely lacking in relevance to the issues before us. But, as this case shows, a crafty lawyer can piece together a series of irrelevancies into a mosaic that juries and judges will find compelling.

be laid off first, provided that the remaining employees have the skill, ability, knowledge and efficiency to perform the required work." Id. at 32. Levolor's decision to lay off Ada Kern rather than her more senior colleagues is obviously consistent with this guideline.

But seniority is not the only factor mentioned in the Handbook. Ada Kern points particularly to the following passage: "[E]mployees who are classified as 'AA' & 'AAA' workers will normally be laid off from their job last, even though they may have less seniority than other employees in the same classification." Id. She claims that because she was a AAA worker, she should have been laid off last, regardless of seniority. The problem with this argument is that Martha Barone and Gloria Vanes were not merely more senior than Ada Kern, but they too had AAA ratings. RT 7/28 at 45. The Handbook provision on which Kern relies may sound compelling, but it does her absolutely no good.

Nor does the Handbook support what appears to be her related argument that Levolor had the responsibility to first lay off lower-rated employees in other job classifications, perhaps Ivan Ortiz, a mechanic, or Jaber Salk, a janitor. See AER at 65. The quoted language is, by its terms, applicable only to "employees in the same classification." In a factory where workers perform specialized functions, this is the only sensible system; it is the system Levolor adopted in its Employee Handbook and which it scrupulously followed in making its February 1985 layoff decisions. Moreover, if the Employee Handbook is a contract, it gives rights to many parties; employees other than Kern were entitled to rely on the guarantees that they would not be bumped by a higher-rated employee in another classification. Had Levolor laid off Ortiz, Salk or some other similarly situated employee to make room for Kern, the company would surely have found itself in litigation with that employee.

Having alleged that Levolor failed to follow its own policies by considering seniority when making layoff decisions, Ada Kern turns around and accuses Levolor of failing to follow its own policies by *not* considering seniority in calling workers back from layoff. In particular, she points to temporary workers hired during the summer of 1985, while she was on layoff, who spent some time cutting wands. Assuming again that Levolor had any obligation to bring back Kern before it hired temporary workers, the uncontroverted evidence showed that Levolor's actions fully complied with its stated policies. Steven Smithling testified that the temporary workers would only occasionally make wands, and that Levolor did not require three full-time wandmakers during that summer, RT 7/28 at 59, 66; there was no evidence to the contrary. Moreover, the Employee Handbook states: "Qualified employees who are recalled from layoff will be called back to work *to their job classification* in the reverse order that they were laid off." AER at 32 (emphasis added). Ada Kern was the first and only wandmaker laid off; no one was hired or recalled before her to be a full-time wandmaker.

Ada Kern's relative seniority and production level indicate that her layoff and recall were in accordance with the procedures described in the Levolor Employee Handbook. At the same time, there is absolutely no evidence of any other mechanism or motivation behind her layoff. The only explanation Kern presented for her discharge is age discrimination, RT 7/29 at 148, and there is no evidence to support this theory.

The majority acknowledges that "no, or virtually no, evidence was presented tending to show that Levolor treated Kern as it did because of her age." Majority op. at 777. The subordinate clause is superfluous. It is uncontroverted that Ada Kern, at 59, was not the oldest of the three wandmakers; the two retained wandmakers were also protected by California's age discrimination statute—Martha Barone was 62 and Gloria Vanes was 52. RT 7/29 at 49–50. Ada Kern presented no evidence that anyone at Levolor ever said or did anything to indicate they believed she was too old for the job. Kern presented no evidence that Levolor ever discriminated against any of its employees because of

their age. She testified that she had no reason to believe that her supervisors had anything against her at all.[7] Ada Kern's lawyer speculated that age discrimination might have been Levolor's hidden motive for mistreating her client. RT 7/29 at 148. Even by way of argument, she offered no other sinister motive for Levolor's action.

In the face of evidence that her layoff was consistent with Levolor's stated policies, Ada Kern presented no evidence to support her only alternative explanation for the discharge. These facts cannot support a jury verdict of breach of contract.

## C. Injury

As we are all taught during our first year of law school, in order to collect damages on a contract claim, the plaintiff must prove that she suffered injury caused by defendant's breach. See California Civil Code § 3300 (1970); *Otworth v. Southern Pacific Transportation Co.*, 166 Cal. App.3d 452, 458, 212 Cal.Rptr. 743 (1985); *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal.App.2d 506, 511, 64 Cal.Rptr. 187 (1967). The only relevant evidence here demonstrates that, had Levolor done every little thing Ada Kern claims it should have, she would still have been laid off. Where, then, is her beef?

We have already seen that Levolor followed precisely the terms of its Employee Handbook. Thus, even if the Handbook was a contract, there could have been no injury because there was no breach. Kern did show that she was not given golf scores. But, assuming Levolor had a contractual duty to prepare golf scores, the company's failure to do so cannot support a damage award if there is no causal connec-

tion to Kern's claimed injuries. The record shows without contradiction that the golf scores were merely a mechanical tabulation of each employee's performance ratings, all of which *were* in fact prepared for Kern as for every other employee. How, then, could a jury reasonably conclude that Ada Kern was injured by Levolor's failure to prepare a golf score for her? The uncontroverted testimony of Levolor officials was that preparation of golf scores for Kern would have made no difference whatsoever. RT 7/28 at 101–02.

The boiling point of water is the same whether expressed as 212° Fahrenheit, 100° Celsius or 373° Kelvin. Applying a mechanical formula for converting Ada Kern's performance ratings into golf scores cannot affect her relative position in the layoff queue vis-a-vis other employees; the fact remains, she was still the least productive and most junior of the three wandmakers. The idea that Kern suffered injury because the company failed to perform some routine and irrelevant computations on her tally sheet, without any consideration of what would have happened had they done so, makes no sense to me. Even if the jury might have drawn some sinister inference from the absence of the calculation, plaintiff still faces the age-old principle that she can only recover if she can show injury. She has shown none.

## D. Good Faith and Fair Dealing

There is really not much to say here. There is insufficient evidence to support a finding that a contract existed, or that Levolor breached it, or that any such breach caused injury to Ada Kern. It would defy logic to then hold that there was sufficient

---

**7.** Q: Mary Camire was the assistant supervisor on the third shift at Levolor; wasn't she?
A: Yes.
Q: And you got along with Mary; didn't you?
A: Oh, yes.
Q: You don't have any reason to think that Mary had anything against you; do you?
A: I don't believe so.
Q: And Steve Smithling was your supervisor on the third shift at the time you were laid off; correct?
A: Yes.

Q: He's the fellow that was very apologetic about having to lay you off; isn't that true?
A: He told me he was sorry he had to do it, yes.
Q: You don't have any reason to think Steve had anything against you; do you?
A: No.
Q: You don't have any reason to think he had anything against you because of your age; is that correct?
A: No.
RT 7/28 at 29–30.

evidence to find that Levolor might have done something to "injure the right of [Ada Kern] to receive the benefits of the agreement." *Foley*, 47 Cal.3d at 684, 254 Cal. Rptr. 211, 765 P.2d 373, quoting *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 658, 328 P.2d 198 (1958). See also *Foley*, 47 Cal.3d at 698 n. 39, 254 Cal.Rptr. 211, 765 P.2d 373 (implied covenant of good faith and fair dealing cannot override employment at will).

\*　\*　\*　\*　\*　\*

The evidence relating to Ada Kern's contract and good faith claims is not of the sort about which reasonable minds might differ. Even if the jury discounted as incredible the testimony of all of Levolor's witnesses, and gave Ada Kern every benefit of the doubt, her case amounts to nothing more than vague allegations about procedures Levolor might have followed but didn't, with no showing that the company was obliged to follow those procedures, or that following them would have made any difference, Ada Kern's only proffered explanation for her discharge was age discrimination, which she left completely unsupported.

Ada Kern was a good worker with five and a half years seniority who was laid off without warning. She was justifiably upset and no doubt felt betrayed. Such feelings, standing alone, are not legally compensable.

## II. Multiple Theories and a General Verdict

Materializing from the other of Ada Kern's allegations is a single explanation for Levolor's supposed misconduct—age discrimination:

Levolor was unfair to Ms. Kern just by its acts alone. But also, it didn't follow its own policy regarding layoff, regarding recall, regarding the benefits of seniority. It did none of those things. They followed nothing that they had given her as an assurance, as a promise that she could depend on.

Plaintiff believes that her age may have been the reason. *There's no other reason. There's absolutely no other reason she shouldn't have been back.* Plaintiff's Closing Argument, RT 7/29 at 148 (emphasis added). Ada Kern brought claims of breach of contract, breach of the covenant of good faith and fair dealing, and age discrimination; but her only coherent theory of Levolor's actions was that the company deliberately discharged her and refused to bring her back because it thought she was too old.

The district court apparently saw Ada Kern's case the same way:

Mr. Brown [Levolor's attorney]: Your Honor, she has three counts in here and that of course means more instructions. That's one of the problems.

The Court: Three counts? You're down to the one count, breach of contract or breach of implied warranty, and what's the third one?

Ms. MacMillin [Ada Kern's attorney]: Age discrimination.

The Court: Age discrimination. But they're all the same. That's all the same ball of wax in federal court. I can join them all together if I want to. We have quite a bit of power over here that you may not have in the state. I told the jury: Breach of contract or breach of implied warranty because of age discrimination. They figured she was too old. So they terminated her.

The question is: Did you do so correctly?

RT 7/27 at 121.

Ada Kern confirmed this view:

The Court: ... That's essentially the charges; isn't it? That you were laid off or you were terminated because you were too old in violation of the contract and good faith and fair dealing?

The Witness [Ada Kern]: I can't think of any other reason.

RT 7/27 at 98.

Even the majority agrees that there was insufficient evidence to go to the jury on Ada Kern's age discrimination claim, majority op. at 777, yet the jury returned a general verdict in her favor. Of course, the jury may not have based its verdict on a finding of age discrimination. After all,

they might have ignored statements by the plaintiff, the plaintiff's attorney and the judge that clearly went to the heart of the case. We don't know what the jury did; and that is precisely why the general verdict in this case cannot stand.

More than a century ago, the Supreme Court explained that, because we cannot read the minds of jurors, a general verdict that may have been based on an improper theory of liability must be reversed. "[The verdict's] generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue error was committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld...." *Maryland v. Baldwin*, 112 U.S. 490, 493, 5 S.Ct. 278, 280, 28 L.Ed. 822 (1884). The Court has three times reiterated the rule in unequivocal terms. *Wilmington Star Mining Co. v. Fulton*, 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708 (1907); *United New York and New Jersey Sandy Hook Pilots Association v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–36, 8 L.Ed.2d 305 (1962). The wisdom of this rule is beyond cavil. As one commentator said of the general verdict: "No one but the jurors can tell what was put into it and the jurors will not be heard to say. The general verdict is as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle of Delphi." Edson R. Sunderland, *Verdicts, General and Special*, 29 Yale L.J. 253, 258 (1920). See also James Wm. Moore & Jo Desha Lucas, 5A *Moore's Federal Practice* ¶ 49.02 (Matthew Bender, 2d ed. 1989).

When the Supreme Court speaks consistently and repeatedly on an issue, the inferior federal courts are bound to follow suit. Most have. See *Morrissey v. National Maritime Union of America*, 544 F.2d 19, 26–27 (2d Cir.1976); *Avins v. White*, 627 F.2d 637, 646 (3d Cir.1980); *Ely v. Blevins*, 706 F.2d 479, 480 (4th Cir.1983); *Jones v. Miles*, 656 F.2d 103, 108 (5th Cir.1981); *Dudley v. Dittmer*, 795 F.2d 669, 673–74 (8th Cir.1986); *Farrell v. Klein Tools, Inc.*,

866 F.2d 1294, 1299–1300 (10th Cir.1989) (also reviewing the rule in other circuits); *North American Graphite Corp. v. Allan*, 184 F.2d 387, 389 (D.C.Cir.1950). The Third, Eighth and Tenth Circuits discuss a harmless error exception, see, for example, *Simko v. C & C Marine Maintenance Co.*, 594 F.2d 960, 967 (3d Cir.1979); *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1258 n. 8 (8th Cir.1980); *Asbill v. Housing Authority of Choctaw Nation of Oklahoma*, 726 F.2d 1499, 1504 (10th Cir.1984), but none has actually found harmless error.

The First Circuit has created a narrow harmless error rule for cases where the elements required to establish one theory of liability are a subset of the elements necessary to establish another theory. In *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir.1981), plaintiffs brought claims of strict product liability and fraudulent misrepresentation. Liability for fraudulent misrepresentation required proof of all of the elements of strict product liability, plus proof of knowingly false statements. Since there was sufficient evidence to support a verdict for plaintiffs on strict product liability, it was irrelevant whether there was evidence of knowing falsehood. The court upheld the general verdict because the jury could not have found for plaintiffs on the fraud claim without also finding strict liability, hence the error was harmless. Id. at 662. *Brochu* involved a very rare situation and, in the few cases where it applies, the *Brochu* rule is fully consistent with *Baldwin*.

The Seventh Circuit, for reasons of its own, has adopted a maverick rule precisely the opposite of that repeatedly announced by the Supreme Court. In order to win on appeal in the Seventh Circuit, the defendant must show that *none* of the plaintiff's theories will support the general verdict. *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 464 (7th Cir.1981). See also *Cross v. Ryan*, 124 F.2d 883, 887 (7th Cir.1941) ("if there is substantial evidence to sustain any one count in favor of each plaintiff, the general verdict must be upheld"). For reasons explained in *Baldwin*, this rule makes

no sense at all, never mind that it contravenes Supreme Court authority.

In this circuit, we state the general rule as follows: "[A] general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury." *Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 1001 (9th Cir.1986). Accord, *Brocklesby v. United States,* 767 F.2d 1288, 1294 (9th Cir.1985).

This absolute prohibition came to a test in *Traver v. Meshriy,* 627 F.2d 934 (9th Cir.1980), a case very similar to *Brochu.* Traver brought several state tort claims against a bank and its employees, as well as a 42 USC § 1983 claim against the bank. The jury returned a general verdict in Traver's favor. On appeal, there was a question as to whether Traver had presented sufficient evidence under federal law to tie the bank to its employees' actions. There was, however, sufficient evidence to hold both the bank and its employees liable on the state claims. The court held that it was unnecessary to reach the question of the bank's liability under section 1983 because the general verdict could be upheld on the state law theory. Id. at 938. The elements necessary to prove the section 1983 claim contained all the elements of the state law claims. The jury, therefore, could not have found the bank liable under section 1983 without also finding state law liability. See id. at 939.

The *Traver* court could have reached its conclusion by explaining that the error was harmless, following the rationale of *Brochu.* Instead, *Traver* described its actions in terms of "discretion," and identified four factors relevant to its exercise in these circumstances: (1) the potential for confusion of the jury that may have resulted from an erroneous submission of a particular claim; (2) whether the defenses of the losing party apply to the count upon which the verdict is being sustained; (3) the strength of the evidence supporting the count being relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to one or more

of the theories in question. *Traver,* 627 F.2d at 938–39.

As is often the case when courts allow themselves discretion to avoid absolute principles, the exceptions have now submerged the rule. In *Roberts v. College of the Desert,* 870 F.2d 1411, 1417 (9th Cir. 1988), plaintiff brought a due process claim, alleging that she had been deprived of her job without a fair hearing. She also brought an equal protection claim, alleging sex discrimination. Our court declined to rule on whether there was sufficient evidence to go to the jury on the equal protection claim. We explained that, in any event, we could exercise discretion under *Traver* and uphold the general verdict for plaintiff on due process grounds. *Roberts,* 870 F.2d at 1417. The *Roberts* court could not possibly have known if the verdict was based on due process, equal protection, or both. Yet the opinion did not cite *Baldwin, Sunkist Growers,* or any of the other cases standing for the general rule; it simply relied on *Traver* without doing the analysis.

Next, *Benigni v. City of Hemet,* 879 F.2d 473 (9th Cir.1988), cited *Traver* for the proposition that the court had discretion to allow a general verdict to stand, without explaining the limited nature of that discretion. We then upheld a general verdict based on due process and equal protection claims, although there may have been insufficient evidence to support the equal protection theory. Id. at 477–78.

Culminating this circuit's erosion of a perfectly good rule, the majority finds this an appropriate case for the exercise of discretion; I can't imagine many that could be worse. The majority finds little potential for confusion because the contract and age discrimination claims were so closely related. Majority op. at 777. But this is precisely why there *was* so much potential for confusion. The age discrimination and contract claims were intimately bound together; at least that was the view of Ada Kern, her attorney and the trial judge. Yet there was no evidence of age discrimination. Had the age discrimination claim been taken away, the jury would have been left

with only Levolor's explanation for the discharge. When the evidence will not support the plaintiff's only theory of liability; the verdict cannot stand. The error is compounded where, as here, there is insufficient evidence to go to the jury on *any* aspect of the plaintiff's case.

While sufficiently interrelated to confuse the jury, Ada Kern's claims were, in a different sense, independent enough that a jury verdict on one claim does not presuppose a verdict on the other. In *Traver*, the jury could not have found section 1983 liability without also finding state tort liability. That is not the case here. It is possible that the jury found that the only way in which Levolor harmed Ada Kern was by discharging her because of her age. That is, in the absence of age discrimination, the jury might have found that Levolor did everything else it was obliged to do or, indeed, that Levolor had no other obligations to Kern.

The majority contends that, in order to find age discrimination, the jury necessarily must have rejected Levolor's assertions that Kern was treated in accordance with company policies and that she was discharged for legitimate business reasons. Majority op. at 777. True enough, but rejection of these defenses is not by itself sufficient to prove liability on the breach of contract and good faith claims; to render a verdict for plaintiff on these claims the jury also had to find that Levolor had some contractual obligation to Ada Kern. See *Otworth*, 166 Cal.App.3d at 458, 212 Cal. Rptr. 743. Age discrimination, on the other hand, is a statutory claim (see Cal. Government Code § 12941(a) (West 1989)); Levolor had a duty to Kern not to discharge her because of her age independent of any contractual agreement between them. To establish a prima facie case of age discrimination, Ada Kern had to show only that (1) she was a member of the protected class (i.e., over 40 years old), (2) she was performing her job satisfactorily, and (3) there was a causal connection between her protected status and her discharge. See *Levy v. Regents of the University of California*, 199 Cal.App.3d 1334, 1348, 245 Cal.Rptr. 576 (1988); *Douglas v.*

*Anderson*, 656 F.2d 528, 531 (9th Cir.1981). Thus, the jury did not have to find a contractual obligation in order to hold Levolor liable on the age discrimination claim.

The *Baldwin* rule exists precisely to deal with the kind of uncertainties this case presents; fine tuning is unnecessary when the facts and law coincide.

### III. Judicial Comments

It is enough to reverse this judgment that there is no evidence to support it and that we cannot tease apart a general verdict that may have been based on a theory the majority recognizes is faulty. The confusion is compounded when the trial judge invades the province of the jury and comments on ultimate issues of fact.

We will reverse a judgment on the basis of judicial behavior at trial where the judge's actions preclude "a fair and dispassionate consideration of the evidence." *Quercia v. United States*, 289 U.S. 466, 472, 53 S.Ct. 698, 700, 77 L.Ed. 1321 (1933). Accord, *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir.1980); *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 531 (9th Cir.1986). We have said that "[a] trial court commits reversible error when it expresses its opinion on an ultimate issue of fact in front of the jury . . . ." *Shad*, 799 F.2d at 531.

### A. "There is age discrimination."

Ada Kern brought an age discrimination claim against Levolor. She presented no evidence to support her charge. She presented insufficient evidence to support any of her other charges. During the trial, the judge commented in front of the jury, "There is age discrimination." RT 7/29 at 47. Subsequently, the jury returned a general verdict in favor of Kern. If we are to sustain such a verdict, I'm not sure I know what a fair trial is.

In upholding the verdict, the majority proposes a rather remarkable reading of the judge's age discrimination comment. "[T]he context," the majority says, "makes it clear that the judge was simply explaining his evidentiary ruling: that evidence

that other workers had not been laid off did not mean that Kern was not discriminated against." Majority op. at 780. That may be what he meant, but it's not what he said; and we must concern ourselves with how the jury perceived his statement. The immediate exchange between Levolor's counsel and the judge, in front of the jury, contains some rather forthright pronouncements:

> Mr. Brown: So there's no age discrimination.
>
> The Court: There is age discrimination. They discriminated against this lady and didn't lay off the others.

RT 7/29 at 47. The majority does not see this as reversible error. They believe that from "context," a jury will take the judge to mean: "I will not allow evidence showing that Levolor failed to lay off other employees who were older than Ada Kern, because such evidence, standing alone, does not prove that Levolor did not discriminate against Ada Kern because of her age."

Not only does this attribute to jurors more sophistication than we normally do, I am not at all convinced that this is what the judge meant. Consider again his statement during the jury instruction discussion:

> The Court: Age discrimination. But they're all the same. That's all the same ball of wax in federal court. I can join them all together if I want to. We have quite a bit of power over here that you may not have in the state. I told the jury: Breach of contract or breach of implied warranty because of age discrimination. They figured she was too old. So they terminated her.
>
> The question is: Did you do so correctly?

RT 7/27 at 121. How is one to interpret this curious comment? It seems that the judge was assuming that Levolor had discharged Ada Kern because she was too old,

but that it could defend itself by demonstrating that the discharge was, nonetheless, within its standard procedures. This, in my view, is a significant indication that the district judge misunderstood the evidence as well as the applicable law. How then can we expect the jury to have drawn an innocuous inference from his comments?

B. "Are you trying to get rid of her?"

The "ball of wax" comment was not made in front of the jury; other comments were.[8] On one of the numerous occasions when the judge took it upon himself to examine witnesses, he confronted Steven Smithling about the failure to give Ada Kern a golf score:

> The Court: Why did you do that? I don't get it. Some you give a golf score to and some you don't and yet they're all in the same category of being the one and only employee in the department.
>
> The Witness: But at the time—
>
> The Court: Nobody else to compare them to, no Jack Nicholas [sic] or Arnold Palmer to compare them to, but you give them a golf score. On what theory?
>
> .    .    .    .    .
>
> The Witness: Just Ada's score wasn't on here.
>
> The Court: Why not?
>
> The Witness: I don't know why not. During the—
>
> The Court: Are you trying to get rid of her? What's your problem?

RT 7/28 at 104. When a cross-examining attorney asks such argumentative questions, the judge sustains an objection and the trial moves on; the jury can attribute the attorney's comments to advocacy. When the judge asks such questions there is no one to overrule him; and the jury gets a clear impression of the judge's view of the evidence.

---

**8.** At one point, the judge apparently was concerned that there might be more than one ball of wax before him:

> The Witness [Ada Kern]: ... And other times I always made coffee. I went upstairs to the lunchroom and made coffee for the breaks and before lunch.

> · The Court: You're not claiming you were discriminated against because you're a woman and they sent you up to make coffee, are you?
>
> The Witness: No, sir. I liked doing it.
>
> The Court: Most girls do.

RT 7/27 at 94.

In *Maheu v. Hughes Tool Co.*, 569 F.2d 459 (9th Cir.1977), the district judge commented on the credibility of a witness when the witness's character was at issue. We found reversible error. Here, Ada Kern presented no evidence of her own on the procedures Levolor used in discharging her. Her case depended critically on the jury's disbelieving Levolor's witnesses, particularly Steven Smithling. The judge committed reversible error when he impeached Smithling.

### C. "I know what the law is."

To show Levolor's insidious motive, Ada Kern relied heavily on Exhibit 105, the June 1985 letter from the Levolor profit-sharing office, notifying her that she had been "terminated" as of February. Her theory was that Levolor discharged her because of her age, and that they never had any intention of bringing her back—that she was terminated, not laid off:

> To me the number one important exhibit is No. 105. And this is the Levolor letter dated June 12, 1985, where it states that Ms. Kern had been terminated as of February 4, 1985. Nothing explaining the fact that maybe this was just terminated from some kind of a payroll record or that maybe she was still on layoff and might come back. It was a very, very clearly written letter and you will be able to see that for yourself. It was termination and it had been effective February 4th, which is what everybody had planned all along; one of the reasons probably that Ms. Kern was never asked to voluntarily layoff or never was in on any of these meetings where the layoff was discussed.

Plaintiff's Closing Argument, RT 7/29 at 144–45.

**9.** This is not the only time the judge displayed his regional bias. Witness the exchange immediately following the "There is age discrimination" comment:

> Mr. Brown: Your Honor, I differ on that.
> The Court: I know you do. But you differ on everything. You know, you come from Chicago, don't you?
> Mr. Brown: I do.

Leslie Craun, a Levolor personnel assistant, testified that "termination" was a generic term Levolor used for all forms of separation from the company, including layoff, discharge and quitting. RT 7/28 at 118. She explained that Levolor did not intend by the June letter to suggest to Ada Kern that she was no longer eligible for recall; the letter did not affect her layoff or seniority status. Id. at 119; RT 7/29 at 5.

The judge would have none of it; Levolor would not be allowed to explain its use of the English language:

> The Court: You cannot use the words "discharge" or "layoff." It's different and I'm so instructing the jury. There's a difference between "layoff", "discharge" and "quitting." And discharge and quitting have nothing to do with layoff even though this witness tries to tell you so. I know what the law is. They are different.
>
> "Layoff" means you're still on the payroll. "Quitting" means you're finished. "Discharged" means you're finished. "Termination" means you're finished. You got it? Despite what she says. She doesn't know what she's talking about. Go ahead.

> .    .    .    .    .

> The Court: I don't know who drafts these things for you people. But some idiot lawyer back East, you know, they draft all kinds of—sometimes absolute trash and they think a judge is going to swallow it. No way. "Termination" and "discharge" are not layoff. And "layoff" is not termination and discharge, period. The law says so and I say so, and you got to take the law from me. Thank you.[9]

> .    .    .    .    .

> The Court: Yeah, contentious Chicago. Come on.
> Mr. Brown: I've dealt with many Los Angeles lawyers, too, that were as contentious as your honor.
> The Court: You're out here in the Golden West so don't give me the Chicago business. RT 7/29 at 47.
> Federal courts have jurisdiction over diversity actions precisely to avoid such regionalism.

The Court: And they did for whatever. And I'm not going to let the jury get the idea that exhibit 5 is a termination. It's nothing of the kind—or a discharge. Nothing of the kind. As a matter of law I tell you it is only a layoff, Exhibit 5.

Now, when they later in June—June 12th, I think it was, in Exhibit 105—tried to say—in my judgment they tried to say that you were terminated as of the date of the layoff. Ridiculous. If that were true she wouldn't have that 50 percent vested, and she's got it. And she got it already. Put it in the bank somewhere. All right. Go ahead.

RT 7/29 at 6, 11, 14.

"Layoff," "discharge," and "termination" are not legally defined terms in a wrongful termination/age discrimination suit; and the parties to this suit obviously defined the terms differently. In light of the importance attached to these words by the plaintiff, the judge had no business offering his own definitions, let alone presenting them as law.[10]

It may be that none of the judge's comments, on their own, constitute reversible error. But taken together, and in the context of a trial where the plaintiff has presented virtually no relevant evidence, they cast serious doubt on whether the jury's verdict reflects a dispassionate evaluation of the facts.

## IV. Damages

The district court found the $237,000 jury verdict "outrageous" and "weird." RT 7/30 at 31. Its final award of $137,000 is only slightly less so. As an initial matter, the judge included in his damage calculation explicit awards of $8,500 for pain and suffering (RT 10/1 at 12), $10,000 for stress (RT 10/1 at 13), and $6,000 for Kern's cost of traveling to California to litigate her claim (RT 10/1 at 12). These awards plainly violate California and federal law. *Foley*, 47 Cal.3d at 696, 254 Cal. Rptr. 211, 765 P.2d 373 (no tort remedies for breach of the covenant of good faith and fair dealing; only contract remedies available in cases of wrongful discharge); *Sawyer v. Bank of America*, 83 Cal.App.3d 135, 139, 145 Cal.Rptr. 623 (1978) (no damages for emotional distress available in contract action); *Dryden v. Tri–Valley Growers*, 65 Cal.App.3d 990, 999, 135 Cal.Rptr. 720 (1977) (as a general rule, damages for mental suffering may not be awarded for breach of contract); B.E. Witkin, 1 *Summary of California Law*, Contracts § 829 (Bancroft–Whitney, 9th ed. 1987) (same); *City Bank of Honolulu v. Rivera Davila*, 438 F.2d 1367, 1371 (1st Cir.1971) (travel expenses not recoverable as costs under 28 USC § 1920); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10 *Federal Practice and Procedure* § 2677 at 370–71 (West, 1983) (same). Thus, at a minimum, the damage award must be reduced by $24,500.

Fully aware of the errors in the district court's calculations, the majority nonetheless upholds the entire damage award. They explain that because the estimate of $110,000 of consequential economic damages by Ada Kern's expert was "necessarily speculative," the $137,000 can be upheld as not "grossly excessive." Majority op. at 778. The majority thus applies a rule of law of which I was not previously aware: the defendant bears the risk of clear errors in a damage calculation, so long as the erroneous total *might* have been legally awarded to the plaintiff. I wonder if the rule also works the other way: when a court neglects to include damages to which a plaintiff is legally entitled, does the plaintiff have to eat the difference as long as the judge or jury might have awarded the lesser amount on a proper theory?[11]

---

One might worry about how a Los Angeles jury assimilated the judge's comments.

**10.** The majority notes that the judge stated elsewhere that Ada Kern was "laid off." Majority op. at 779. This comment referred to Levolor's February 1985 actions, however. The above-quoted passages show that the judge took a very different view of the June letter.

**11.** Contrary to the majority's characterization of this critique, the error to which I refer is not in the economic expert's calculations. See majority op. at 778 n. 3. Rather, the error that the majority approves is in the district court's award of damages for pain and suffering, stress and travel costs. The majority concludes that these awards were erroneous, and then ignores

This is not the worst of it, however. Assuming that Levolor had any liability at all, a $110,000 award cannot be supported by the record. This figure, developed by Ada Kern's economic expert, estimates lost salary and benefits from the time Kern was discharged until age 65, a period of six years. RT 7/27 at 74, 79. This amount reflects no reduction for income or benefits she might have earned by returning to work at Levolor, or taking another job. In other words, it does not take into account potential mitigation of damages.

The majority is not much worried about this discrepancy. Looking at the record, they affirm as not clearly erroneous the district court's conclusion that "Levolor had failed to prove that Kern did not adequately mitigate her damages." Majority op. at 779. Where in the record does this conclusion appear? I find the following explicit conclusion that Ada Kern *had* failed to mitigate damages once back in Ohio:

> Because by that time, she and her husband had taken off, had gone back to Ohio, their original home, and she received a letter there and turned it over to her lawyer. But no effort was made to accept employment, and so, in my view, there was no proper mitigation of damages, which there should have been.

RT 10/1 at 6. The district judge recognized that there was no evidence from which a rational jury could have found mitigation. RT 7/30 at 18 ("Now, I haven't heard any testimony that the plaintiff made reasonable efforts after moving to Ohio to

get a job."). That the judge subsequently failed to limit the award of damages accordingly is no reason for this court to sit idly by. The district court's failure was not an implicit "conclusion" that Levolor had failed to prove lack of mitigation; it was error and should be corrected.

A discharged employee has a duty to mitigate damages by seeking other employment through the exercise of reasonable diligence. *California School Emp. Ass'n v. Personnel Comm'n*, 30 Cal.App.3d 241, 106 Cal.Rptr. 283, 286 (1973); *Stone v. Bancroft*, 112 Cal. 652, 657, 44 P. 1069 (1896). The measure of recovery must be reduced by any amount the employee has earned, or with reasonable diligence could have earned, since the discharge. *California School*, 106 Cal.Rptr. at 288. Liability ends when the employee fails to take reasonable steps to find new employment. See *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 867–68 (9th Cir.1980).

Ada Kern returned to Ohio in September of 1985. Once there, she made no attempt to look for another job. RT 7/27 at 113. The damage award therefore must be reduced by a reasonable estimation of the amount Kern would have earned from that date, had she but looked for a job.[12]

There is yet another basis for reducing the award here: In October 1985, Levolor attempted by mail to offer Ada Kern her job back. RT 7/29 at 58–59; AER at 79. When the letter reached her in Ohio, Kern did not respond, but simply turned the letter over to her attorney.[13] RT 7/28 at 19.

---

the errors in approving the damage award. Id. at 778.

**12.** Ada Kern testified that she had a skin rash that prevented her from looking for a job in Ohio. RT 7/27 at 113. This might explain her failure to look for work, but it does not entitle her to remain on Levolor's payroll at full pay until retirement. If the skin rash prevented Kern from looking for work, it would also have prevented her from working. (Kern did not claim that the rash was caused by her discharge.) The estimate of consequential damages was based on full employment until age 65; if Ada Kern was disabled and incapable of working, the damage award would have to be reduced accordingly.

**13.** Kern, and the majority, argue that the October letter was not an offer for the same job, but merely a statement that there was a job opening. See majority op. at 778 & n. 4. But the letter advised Kern to "please contact . . . Levolor Lorentzen as soon as you can—we have been trying to reach you by phone. . . . We have a job opening at this time that [we] would like to discuss with you." AER at 79. Levolor can hardly be held responsible for failing to present a final offer when Kern never responded. Contrary to the majority's assertion, a response would not have required Kern to "return to California." See majority op. at 778 n. 4. She only had to pick up the phone.

From that date or shortly afterwards, Kern could have earned precisely what she would have earned had she been employed with Levolor since February. Levolor's liability ended when Ada Kern did not respond to the company's letter. See *Billetter v. Posell,* 94 Cal.App.2d 858, 861–62, 211 P.2d 621 (1949) ("If the employee is offered his former employment for the same time and at the same rate of wages for which he was originally employed or is otherwise protected against loss he is barred from recovery of damages for wrongful discharge."). See also *Ford Motor Co. v. EEOC,* 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982) (In Title VII litigation, an employee forfeits his right to backpay if he refuses a job "substantially equivalent to the one he was denied."). If Levolor had a contractual obligation to employ Ada Kern, they fulfilled that obligation with their offer of reemployment.

The majority goes out of its way to explain that by the time Kern received the October job offer, she had filed a complaint with the EEOC. Majority op. at 775. What implication are we to draw from this pointed reference in the majority opinion? Either that Levolor is to be criticized for offering Kern a job in order to avoid a lawsuit, or that Kern is to be excused from responding to the offer because of her pending litigation. The majority sets a dangerous precedent either way.

It is the function of the EEOC to attempt conciliation between employer and employee when there is a dispute over an employment decision. The Age Discrimination in Employment Act (ADEA) prohibits an aggrieved employee from filing a lawsuit within 60 days after filing a complaint with the EEOC. 29 U.S.C. § 626(d) (1982). During this period the EEOC is charged with notifying all persons named in the complaint. Id. The purpose of the waiting period is to allow the EEOC to "promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." Id.;

*Bean v. Crocker National Bank,* 600 F.2d 754, 760 (9th Cir.1979); Barbara Lindemann Schlei & Paul Grossman, *Employment Discrimination Law* 492 (BNA, 2d ed. 1983). The ADEA, like other discrimination laws, strongly favors settlement over litigation. To criticize an employer for attempting conciliation following the filing of an EEOC complaint, or to excuse an employee from accepting conciliation because she has filed such a complaint, undermines this very important purpose of our employment discrimination laws. The majority's offhand remark may well serve as a disincentive to both employers and employees to attempt conciliation.

That Ada Kern happened to be in Ohio when Levolor's job offer reached her does not relieve her of her obligation to accept the offer or forego compensation. Contract damages are not an annuity; plaintiffs cannot insulate themselves from mitigation by moving far away and refusing to come back to resume their employment.

The general rule on contract damages in California is enunciated in California Civil Code § 3300:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

The California courts have interpreted this section as incorporating the limiting rule of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854): "[G]eneral damages that may be awarded for breach of contract are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by the parties at the time they contracted, as the *probable result* of the breach." *Glendale Federal Savings & Loan Assoc. v. Marina View Heights Dev. Co.,* 66 Cal.App.3d 101, 125, 135 Cal.Rptr. 802 (1977) (emphasis added). See also B.E.

Witkin, 1 *Summary of California Law,* Contracts § 815 (Bancroft–Whitney, 9th ed. 1987) (same); Arthur Linton Corbin, 5 *Corbin on Contracts* § 1006 et seq. (West, 1964) (same); Walter H.E. Jaeger, 11 *Williston on Contracts* § 1344 (Baker, Voorhis, 3d ed. 1968) (same); E. Allan Farnsworth, *Contracts* § 12.14 at 874 (Little, Brown 1982) (same); Restatement (Second) of Contracts § 351 (1981) (same).

The evidence relating to Kern's relationship with Levolor cannot support the conclusion that her move to Ohio was a "probable result" of the breach when the contract was made. Ada Kern's husband testified that the move was brought on by the financial hardship resulting from her discharge *and his own.* RT 7/27 at 28–29. The contribution of her husband's lost job probably negates Ada Kern's discharge as a proximate cause of the move. In any event, it was hardly "probable" in 1979 when Kern began working for Levolor that, if she were laid off six years later, she would within months move out of the state. Ada Kern's move to Ohio is thus not properly considered in calculating damages.

Nor is the rule in *Billetter* suspended because moving back to California would entail some hardship. Levolor offered Ada Kern her job back. The company is not precluded from honoring its obligation (if it had one) because Ada Kern, by her own actions, made it inconvenient to accept her former job. The gravamen of Ada Kern's complaint was that she deserved compensation for something Levolor had wrongfully taken from her. When she is offered precisely that over which she was suing, she cannot be heard to say that she would rather stay home and be paid for doing nothing. Ada Kern was not relieved of her duty to take all reasonable steps to minimize damages because she had placed distance between herself and the object of her litigation.

Conclusion

Ada Kern is a sympathetic plaintiff. She worked for Levolor for almost six years, achieving the company's highest performance rating. Without warning, on her 59th birthday, the company laid her off. By a cruel coincidence, her husband lost his job shortly thereafter.

Ada Kern and her husband have suffered hardship; certainly the jury had no difficulty expressing their sympathy. But courts do not sit to compensate the luckless; this is not Sherwood Forest. Courts mediate between parties, and must see that each side is treated fairly. The law does not sanction unjustified wealth transfers. Consequently, in order to prevail at trial, a plaintiff must prove that her injuries were caused by some action of the defendant's in abrogation of a duty imposed by law.

Ada Kern failed to meet her burden; the jury failed to consider the evidence rationally; the district court failed to calculate damages properly. The court of appeals has a responsibility to correct these errors. Rules of law are the engines of fairness in the courts; they are among the principal mechanisms by which citizens, employers no less than employees, order their lives. The majority has allowed their sympathy for Ada Kern to blind them from the law. I dissent.