O. J. WHITE v. J. R. PLEASANTS.

(Filed 17 December, 1945.)

**1. Contracts § 6: Brokers and Factors § 3: Fraud, Statutes of, § 9—**

Oral contracts between real estate brokers and their principals for the sale of land of the principal are enforceable as such.

**2. Brokers and Factors § 8: Contracts § 16—**

A simple contract of agency for the sale of land for an indefinite and unstated time is generally revocable, in good faith, at any time before the broker makes the sale, or produces a purchaser who is ready, willing and able to buy on the terms set forth by the principal.

**3. Contracts § 16: Brokers and Factors §§ 10, 12—**

Where a broker has made a sale of land, or has produced a purchaser who is ready, willing and able to buy on the terms set forth by the principal, the principal, although having the power, has no legal right, without incurring liability for the wrongful termination, to revoke the broker's agency to sell.

**4. Brokers and Factors §§ 10, 12—**

When under an existing contract of agency to sell land in which no stipulation is made for compensation, the broker has made a sale, or produced a purchaser who is ready, willing and able to buy the land, the rule seems to be that the broker is entitled to the reasonable value of his services.

APPEAL by plaintiff from *Stevens, J.,* at September Term, 1945, of DURHAM.

Civil action commenced before justice of peace of Durham County, North Carolina, for recovery of $50.00 on implied contract for commissions in sale of real estate, tried in Superior Court *de novo* on appeal thereto from judgment of said justice of peace court.

Upon the trial in Superior Court plaintiff testified in pertinent part as follows: "On or about March 2nd of this year, and for the past three years, I have had license to engage in real estate business in Durham . . . As a licensed real estate dealer, I sell real estate on commission for other people . . . About the middle of February, 1945, I went to the defendant's office to ask him about some property which he was interested in and he . . . advised me that he had a lot in Forest Hills which he would like for me to sell for him . . . At this time . . . defendant took the map or drawing or blue print . . . of lot . . . and showed it to me. I asked what his price on the lot was and he told me $1000. I said: 'Mr. Pleasants, I will sell that lot.' Mr. Pleasants said: 'I wish you would. I want my money out of it . . .' He gave me the dimensions of

the lot as 120 by 230. I made a notation or memorandum of the dimensions of the lot . . . following . . . 120 x 230, $1000—J. R. Pleasants. . . . Pursuant to this agreement with defendant, I ran an ad in Durham papers advertising the said lot for sale . . . in the Durham Sun on March 2nd, 1945, as follows: 'Lots for sale. Here are some lots you will like. Forest Hills—120 x 230—$1000,' etc. Signed 'O. J. White.' . . . I also ran this ad in Morning Herald of March 3, 1945 (same as above). Immediately after on the same day while I was running these ads in papers, I met the defendant on the street . . . and told him I had advertised his lot for sale in the Durham papers and the defendant then said, 'Well, I'm glad you have. That's a good buy; one of the best bargains in Durham' . . . he said, 'All right, go ahead and sell it. It's one of the best buys in Durham.' This conversation occurred on Saturday, March 3rd . . . I carried Mrs. Campbell in my car to see the lot . . . Later she . . . said she did not wish to purchase the lot. I also carried in my car Mr. W. O. Wilkins and showed him the same lot that I showed Mrs. Campbell. I quoted him a price of $1000 cash, which was the price the defendant told me to sell it for. I sold the lot to W. O. Wilkins for $1000 cash and at the time I made the sale Mr. W. O. Wilkins gave me his check in the sum of $100 as a deposit on said lot. The balance was $900 as stated on face of check." (Check offered—reading: "Durham, N. C., 3/9/1945. Home Savings Bank. Pay to the order of O. J. White, Agent, $100.00—One Hundred and no/100 Dollars. Dep. on lot 120 x 230—Bal. $900.00," signed "W. O. Wilkins.") "When I received this check, I carried it to the defendant's office on the same day and told him I had sold the lot. Prior to taking the check to defendant, I saw him and advised him that I had sold this lot and the defendant advised me that one of his friends was interested in purchasing the lot but said that his friend had not purchased the lot and the one who brought the check to him first would get the lot. I later returned with the check for the defendant, at which time the defendant advised me that he had not sold his lot to anyone and no one had paid him any money on it. I then advised the defendant that here was a check for $100 deposit on the lot, and put the check on the defendant's desk. The defendant said he would not accept the check, but I left it on his desk. I advised the defendant the first time I saw him on March 9th that I had sold his lot and wanted a deed, and I advised him the same thing when I gave him the check. The defendant refused to execute a deed for the lot, I asked him to pay me for my services or commission, which he refused to do. After he refused . . . I brought this suit . . . W. O. Wilkins advised me and I so advised the defendant, that he was ready, willing and able to pay $1000 cash for this lot upon the execution of the deed by the defendant . . . The usual commission in a sale of this kind is 5%, or $50."

Then, on cross-examination, plaintiff continued: "When I first saw him (defendant) on March 9th I did not have any check. I told him I had a sale for the lot and wanted the deed for it. I did not offer him any money at that time . . ."

W. O. Wilkins, as witness for plaintiff, testified in pertinent part as follows: ". . . On or about March 1945 the plaintiff took me out to Forest Hills and showed me a lot. The lot was about 120 by 230 feet . . . It was my information that the lot was owned by Mr. Pleasants, the defendant. The plaintiff . . . advised me that he could sell me the lot for $1000. I purchased this lot for $1000. I gave him a check for $100 as a deposit on the lot. (Identifies check.) I was ready, willing and able on March 9th to pay $1000 for that lot in Forest Hills as soon as I could get a good deed . . . and have been ready, willing and able to pay this price for the said lot since this time." Then, on cross-examination, the witness continued: "I gave Mr. White the check the same day it is dated between 2:00 and 3:00 o'clock. I agreed to pay $1000 for the lot."

At close of evidence for plaintiff, the court allowed motion of defendant for judgment as in case of nonsuit, and entered judgment accordingly. Plaintiff appeals therefrom and assigns error.

*J. Grover Lee for plaintiff, appellant.*
*W. H. Hofler for defendant, appellee.*

WINBORNE, J. Taking the evidence in the light most favorable to plaintiff, we are of opinion that exception to the ruling of the court below in granting motion for judgment as in case of nonsuit is well taken. The evidence offered by plaintiff appears to be sufficient to take the case to the jury upon appropriate issues.

Appellee concedes at the outset that oral contracts between real estate brokers and their principals for the sale of land of the principal are enforceable as such. *Abbott v. Hunt,* 129 N. C., 403, 40 S. E., 119; *Lamb v. Baxter,* 130 N. C., 67, 40 S. E., 850; *Smith v. Browne,* 132 N. C., 365, 43 S. E., 915; *Palmer v. Lowder,* 167 N. C., 331, 83 S. E., 464.

And it is not debated on this appeal that plaintiff has introduced evidence tending to show that defendant requested plaintiff to sell a certain lot of land for him at the price of $1000—without fixing any time limit within which plaintiff was authorized to sell the lot, and without specifying compensation to plaintiff for selling it.

It is a settled principle of law that a simple contract of agency for the sale of land for an indefinite and unstated time is generally revocable, in good faith, at any time before the broker makes the sale of the land, or produces a purchaser who is ready, willing and able to buy on the

terms set forth by the principal. But where the broker has made a sale of the land, or has produced a purchaser who is ready, willing and able to buy on the terms set forth by the principal, the principal, although having the power, has no legal right, without incurring liability for the wrongful termination, to revoke the broker's agency to sell. 12 C. J. S., 46, Brokers, section 16; 8 Am. J., 1007, Brokers, section 39. See also *Abbott v. Hunt, supra; Clark v. Lumber Co.,* 158 N. C., 139, 73 S. E., 793; *Crowell v. Parker,* 171 N. C., 392, 88 S. E., 497; *Real Estate Co. v. Sasser,* 179 N. C., 497, 103 S. E., 73; *Hagood v. Holland,* 181 N. C., 64, 106 S. E., 154; *House v. Abell,* 182 N. C., 619, 109 S. E., 877; *Olive v. Kearsley,* 183 N. C., 195, 111 S. E., 171; *Gossett v. McCracken,* 189 N. C., 115, 126 S. E., 117; *Johnson v. Ins. Co.,* 221 N. C., 441, 20 S. E. (2d), 327; *Lindsey v. Speight,* 224 N. C., 453, 31 S. E. (2d), 371; *Ins. Co. v. Disher, ante,* 345.

Moreover, when under an existing contract of agency to sell land in which no stipulation is made for compensation the broker has made a sale, or produced a purchaser who is ready, willing and able to buy the land, the rule seems to be that the broker is entitled to recover the reasonable value of his services. See *Lindsey v. Speight, supra,* where the authorities are assembled. See also *Thomas v. Realty Co.,* 195 N. C., 591, 143 S. E., 144.

In the light of these principles of law applied to the evidence offered by plaintiff, the judgment below is

Reversed.