974 F.2d 1342
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
James HENDRY, an individual doing business as Synergy Sales
Engineering, Plaintiff/Appellee/Cross-Appellant,
v.
EXIDE ELECTRONICS CORPORATION, a North Carolina corporation,
Defendant/Appellant/Cross-Appellee.
 Nos. 90-15964, 90-16148.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 12, 1992.
Decided Sept. 8, 1992.
Motion to Recall and Clarify Mandate Granted
Jan. 29, and May 27, 1993.
 
 Appeal from the United States District Court for the Northern District of California, No. C-89-0077 SAW; Stanley Weigel, District Judge, Presiding.
 N.D.Cal.
 REVERSED and REMANDED.
 
 Before CHOY, HUG and RYMER, Circuit Judges
 
 1
 MEMORANDUM*
 
 
 2
 This case involves a dispute between Exide Electronics Corporation ("Exide"), a manufacturer of electrical equipment including uninterruptible power supply ("UPS") systems and James Hendry, its former sales representative doing business as Synergy Sales Engineering ("Hendry" or "Synergy"). Exide appeals from a $14.9 million judgment entered on a general verdict for Hendry.[1] Hendry cross-appeals from the district court's denial of his request for attorney's fees on the basis of Exide's alleged bad faith conduct before and during the litigation and requests review of the district court's jury instruction concerning punitive damages. Because we find that the district court erred as a matter of law in instructing the jury that North Carolina law implies a duty of good faith in the termination of an at-will employee and that Exide could not terminate Hendry in bad faith in order to avoid paying him commissions, we reverse.
 
 I. FACTUAL BACKGROUND
 
 3
 Hendry's claims are based on Exide's alleged breach of two contracts, the Power Systems Agreement for Fiscal Year 1987 (the "Rep Agreement") and an oral agreement that Hendry contends he and Exide entered into sometime in late December 1986 or early January 1987.[2]
 
 
 4
 The written Rep Agreement executed by Exide and Hendry expressly superseded all prior contracts between the parties regarding UPS sales, and authorized Synergy to sell Exide UPS products in Northern California and most of Nevada. Synergy's performance under the contract was to be measured according to the volume and mix of products it sold. The Rep Agreement provided that it would expire automatically and without notice after one year, but also provided that either party could terminate the agreement without cause on 120 days notice.[3] The agreement specifically contemplated payment of post-termination commissions. It set out a procedure for calculating those commissions whereby, after Hendry received a termination notice, the parties would negotiate a list of the pending UPS projects that Hendry was soliciting at the time he was terminated ("protect list"). If during the 120-day notification period any of those projects on the protect list resulted in "an acceptable purchase order delivered to Exide," Synergy was entitled to payment of the appropriate commission for that project. Id. at p I(9) (the "post-termination compensation provision").
 
 
 5
 On March 2, 1987 Exide invoked the without cause termination clause and terminated Synergy. The parties subsequently exchanged and negotiated lists of Synergy's pending UPS projects.
 
 
 6
 In addition, and while the Rep Agreement was still in effect, Hendry claims that he entered into an oral agreement with Philip Tompkins, Exide's Vice President for Domestic Sales. Exide disputes that any oral agreement ever was made. According to Hendry, sometime in late December 1986 Tompkins phoned him. During that call he claims that they agreed that Exide would pay him a reduced 30% commission on the $1 million UPS contract that Exide was awarded in October 1986 for Warner-Robbins Air Force Base ("Warner-Robbins contract") in exchange for a 100% commission (less destination credit if the shipment was outside Synergy's assigned territory), on all future UPS projects out of McClellan Air Force Base ("McClellan"). They also agreed that Exide would cooperate fully with and support Synergy's representatives at McClellan and that Exide would coordinate a meeting among Exide, Synergy, and McClellan.
 
 
 7
 On January 13, 1987 and February 12, 1987 Hendry wrote and sent two identical letters to Tompkins. Both letters reiterated the terms discussed during the alleged telephone call and contained no additional terms. Exide maintains that no one at Exide wrote back to Hendry or confirmed his understanding as set forth in these letters.
 
 
 8
 The heart of Hendry's case is that Exide acted in bad faith when it terminated him as its sales representative in order to avoid paying commissions he was entitled to in connection with three UPS contracts: a $621 million five-year Air Force UPS requirements contract that was solicited out of the Air Logistics Center at McClellan (the "ALC contract");[4] the sale of UPS equipment to GTE Government Systems;[5] and OEM sales made in Hendry's territory.[6] Exide disputes that it terminated Hendry to deny him commissions and contends that he was terminated because of his poor sales performance in the western region.
 
 II. STANDARD OF REVIEW
 
 9
 The question presented in this appeal involves interpretation of North Carolina law. We review the district court's state law determinations de novo and its determinations of the applicable state law are not entitled to any deference. Salve Regina College v. Russell, 111 S.Ct. 1217, 1221-25 (1991); see In re McLinn, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).
 
 III. ANALYSIS
 A. General Verdict
 
 10
 Hendry contends that the judgment below must be upheld if it can be supported on any theory properly presented to the jury and argues that, because Exide failed to challenge the fraud verdict and it was properly presented to the jury, under this rule the court should affirm the judgment on the basis of that claim. Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 777 (9th Cir.1990); Begnini v. City of Hemet, 879 F.2d 473, 478 (9th Cir.1988); Roberts v. College of The Desert, 870 F.2d 1411, 1417 (9th Cir.1988). Exide responds that we must reverse the general verdict if any one theory of liability improperly was presented to the jury and argues that we should not apply the narrow exception articulated in the decisions cited by Hendry in this case.
 
 
 11
 The general rule in this Circuit is that "a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury." Kern, 879 F.2d at 777 (quotation & citations omitted). This rule is in accord with a long line of precedent in which the Supreme Court has held that, when faced with a general verdict where "upon any one issue error was committed, either in the admission of evidence, or in the charge of the court [such a general] verdict cannot be upheld...." City of Columbia v. Omni Outdoor Advertising, Inc., 111 S.Ct. 1344, 1356 (1991); Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 29-30 (1962); United New York & New Jersey Sandy Hook Pilots Ass'n v. Haleki, 358 U.S. 613, 619 (1959); Maryland v. Baldwin, 112 U.S. 490, 493 (1884).
 
 
 12
 Despite this general rule, in our discretion, we may "construe a general verdict as attributable to one of several theories if it was supported by substantial evidence and was submitted to the jury free from error." Kern, 899 F.2d at 777.[7] In deciding whether it to exercise this discretion, however, the factors we must consider are: (1) the potential for confusion of the jury that may have resulted from erroneous submission of a particular claim or cause of action; (2) whether the losing party's defenses apply to the count upon which the verdict is being sustained such that they would have been considered by the jury with reference to that count; (3) the strength of the evidence supporting the count being relied on to sustain the verdict; and, (4) the extent to which the same disputed issues of fact apply to the various legal theories. Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir.1980); Kern, 899 F.2d at 777.
 
 
 13
 We balance these factors in an ad hoc manner, without any one factor being accorded particular weight and without necessarily considering all four factors in each case. See, e.g., Beningi, 879 F.2d at 478 (exercising discretion on basis of strong evidence of two factors); Syufy, 793 F.2d at 1002 (reversing and refusing to exercise discretion on poor showing of only two factors).
 
 
 14
 Hendry urges us to affirm the general verdict under the Traver exception arguing that the fraud theory properly was submitted to the jury and that there was substantial evidence to support that theory of liability. We conclude that the Traver exception is not applicable in this case and decline to exercise our discretion.
 
 
 15
 Only two of our opinions have considered the potential for jury confusion as a significant factor in applying the Traver factors. In Syufy Enterprises we noted that the potential for jury confusion "was great" because the case was complex, involved multiple antitrust theories, and each claim involved distinctive factual and legal components. Id. at 1001-02. In Kern, although the jury improperly was instructed on an age discrimination claim, we concluded that the jury was unlikely to be confused because Kern's counsel had stressed the properly presented contract claim in closing argument and the age discrimination claim only presented as a possible ground for the defendant's disparate treatment of Kern and never was offered as an independent ground for recovery. Kern, 899 F.2d at 777.
 
 
 16
 This case, like Syufy and Counts v. Burlington Northern Railroad, 952 F.2d 1136 (9th Cir.1991), involved five theories upon which Hendry sought recovery, each involving differing legal components, and many requiring evaluation of distinct factual circumstances. Id. at 1140; Syufy, 793 F.2d at 1001-02. Moreover, unlike in Kern, Hendry's counsel apparently did not even mention the fraud claim in closing arguments and requested a damages calculation under the written contract rather that on the basis of a fraud damages calculation. Kern, 899 F.2d at 777. This factor, therefore, weighs against our exercising discretion.
 
 
 17
 Similarly, the only two opinions in which we applied the second Traver factor regarding defenses both involved claims for which the defenses offered were identical. Traver, 627 F.2d at 939 (defenses of reasonable conduct and action in good faith apply to the improperly presented section 1983 claim as well as to the properly instructed state tort actions); Kern, 899 F.2d at 777 (defense of treatment in accordance with company policy and discharge for legitimate business reason same for both proper contract claim and improper age discrimination claim). In Kern we noted that this fact meant that "[t]he jury could not have found in favor of Kern under any of her theories without rejecting these defenses." Id.
 
 
 18
 Conversely, in this case Exide offered different defenses to each theory of liability and thus the jury could have found for Hendry on any one claim without necessarily being compelled to reject a valid defense that was applicable only to that separate claim. Thus, this factor also weighs against exercise of discretion.
 
 
 19
 Significantly, in every case in which we have applied the Traver exception to uphold a general verdict under the final Traver factor, the various legal theories at issue involved virtually identical disputed issues of fact.
 
 
 20
 In Kern, under both the age discrimination and the contract claims, Kern urged that, without adequate explanation, he was treated differently from other employees. Kern, 899 F.2d at 778. In Beningi we stated that, although the fourteenth amendment claim was not supported on the equal protection ground, we nonetheless could uphold the general verdict under the due process theory because both claims involved the same disputed issues of fact "both being grounded on the allegation of arbitrary law enforcement activity for the purpose of harassment and interference." Beningi, 879 F.2d at 478; see also Roberts, 870 F.2d at 1417. Finally, in Traver we noted that the section 1983 claim, which improperly was submitted to the jury, was "all but derivative" of the state tort claims on which we sought to uphold the general verdict. Further, in that case a finding of section 1983 liability "would necessarily encompass a finding of liability on one or more of the state law claims," that were properly before the jury. Id. at 939.
 
 
 21
 In contrast, Hendry's claims involve largely differing disputed issues of fact. The fraud claim, for example, was distinct in its requirement of evidence establishing that Exide was aware that its alleged promises were false. This case is more like Syufy where we held that the Traver exception was inapplicable, in part, because "although many of the claims shared common issues of fact each also involved distinctive legal and factual components." Syufy, 793 F.2d at 1002.
 
 
 22
 Finally, with regard to the strength of the evidence supporting the fraud count, under the Traver factors we require more than "marginal evidence," id., although precisely what level of proof must be present is unclear. Kern, 899 F.2d at 798 (evidence "while not overwhelming, strong"); Begini, 879 F.2d at 478 ("clearly supported"); Traver, 627 F.2d at 939 ("ample evidence"). We need not attempt an evaluation of this factor--an investigation that particularly would be onerous given the parties' disagreement over the facts presented at trial--because all three of the other Traver factors clearly weigh against our exercising discretion in this case.
 
 
 23
 In conclusion, we reject Hendry's request to uphold the general verdict on the basis of the fraud verdict and adhere to the general rule that requires reversal of the district court judgment if any one theory improperly was presented to the jury.
 
 
 24
 B. North Carolina Does Not Imply a Covenant of Good Faith to Prohibit Termination in Bad Faith of an At-Will Employee
 
 
 25
 Exide contends that the district court erred when it instructed the jury that Exide was bound by the implied covenant of good faith in terminating Hendry and that if Exide terminated Hendry in bad faith in order to avoid paying him commissions, it would have breached the Rep Agreement.[8] Our review of North Carolina law confirms that the district court erred in instructing the jury on implied good faith.
 
 
 26
 In its recent decision in Amos v. Oakdale Knitting Co., 416 S.E.2d 166 (N.C.1992), the North Carolina Supreme Court made clear that North Carolina would not imply a covenant of good faith to prohibit Exide from terminating Hendry in bad faith. In Amos the court clarified the scope of its decision in Coman v. Thomas Manufacturing Co., 381 S.E.2d 445 (N.C.1989) in which it explicitly had recognized a public policy exception to the employment at-will doctrine and authorized a tort claim for the wrongful discharge of an at-will employee who has been terminated in violation of public policy. Id. at 447.[9]
 
 
 27
 In addition to this holding, the court discussed in dictum the more general question of bad faith discharge. In this regard the court stated that it had "never held that an employee at will could be discharged in bad faith," id. at 448 (citing Haskins v. Royster, 70 N.C. 601 (1874) & Malever v. Jewelry Co., 25 S.E.2d 436 (1943)), and that courts in other states "have recognized wrongful discharge theories characterized either as the bad faith exception to the at-will doctrine or under the implied covenant of good faith and fair dealing." Id. at 448 (citations omitted). Finally, the court added that "[b]ad faith conduct should not be tolerated in employment relations, just as it is not accepted in other commercial relations." Id.
 
 
 28
 In the aftermath of the Coman decision courts interpreting this bad faith dictum split as to its meaning.[10] Amos, however, settled any debate as to the scope and meaning of Coman by explicitly holding that the Coman discussion of bad faith discharge was merely dictum, and that the Coman holding only established a limited exception to the employment-at-will doctrine that prohibits the termination of at-will employment contracts for an unlawful reason or a purpose that contravenes public policy, but does not recognize an independent claim for wrongful discharge in bad faith. Amos, 416 S.E.2d at 173.
 
 
 29
 The Rep Agreement was an at-will employment contract because, although it was not indefinite in duration and was scheduled to expire automatically in one year, during that year either party was free to terminate the agreement "without cause." Thus, given Amos, the district court's instruction regarding good faith termination was erroneous.
 
 
 30
 Hendry, however, urges that the district court's implied good faith instruction was proper under North Carolina's "procuring cause rule."[11] Because the North Carolina Supreme Court's holding in Amos did not discuss and apparently left intact this rule, we address whether, despite the Amos decision, the district court's good faith instruction nonetheless was proper under this rule.
 
 
 31
 North Carolina's procuring cause rule implies a good faith obligation in the termination of agency agreements, and specifically in real estate listing agreements. See, e.g., Realty Agency, Inc. v. Duckworth & Shelton, 162 S.E.2d 486, 491 (N.C.1968); White v. Pleasants, 36 S.E.2d 227, 229 (N.C.1945); Jaudon v. Swink, 276 S.E.2d 511, 513 (N.C.Ct.App.1981). Courts have construed this good faith obligation as prohibiting a principal from terminating the agency in order to avoid paying the agent a commission. Jaudon, 276 S.E.2d at 513 (citing Cromartie v. Colby, 108 S.E.2d 228 (N.C.1959) & Martin v. Hooy, 10 S.E. 83, 84 (N.C.1889).[12]
 
 
 32
 Notably, however, North Carolina courts impose an important limitation on the operation of the procuring cause rule that specifically excludes from the rule's reach circumstances where the parties involved expressly have contracted out from under the rule. Id. at 491; Brown v. Fulford, 316 S.E.2d 220, 222 (N.C.1984); Castle & Assocs. v. Custom Molders, Inc., 311 S.E.2d 640, 641 (N.C.Ct.App.1984); Cooper v. Henderson, 284 S.E.2d 756, 758 (N.C.Ct.App.1981); accord Masajarian v. Mark Lighting Fixtures Co., 595 F.Supp. 869, 872 (D.Conn.1984); Ullmann v. May, 72 N.E.2d 63, 67-68 (Ohio S.Ct.1947); Willis v. Champlain Cable Corp., 748 P.2d 621, 627-28 (Wash.1988); see also Balzer/Wolf Assocs. v. Parlex Corp., 753 F.2d 771, 774-75 (9th Cir.1985). Thus, when stated its entirety, the procuring cause rule provides that "[i]f any act of the broker in pursuance of his authority to find a purchaser is the initiating act which is the procuring cause of a sale ultimately made by the owner, the owner must pay the commission, provided the case is not taken out of the rule by the contract of employment." Realty Agency, 126 S.E.2d at 491 (emphasis added).[13]
 
 The Rep Agreement provided that:
 
 33
 [a]t the time of termination, a list of pending orders will be received by the parties and appropriate compensation will be due on all such quotations which resulting an acceptable purchase order delivered to Exide Electronics within the required notification period. An acceptable order shall be an order which satisfies all requirements as set forth in the Exide Electronics Sales Manual current at the time of submission of order.
 
 
 34
 Rep Agreement at p I(9). This post-termination compensation provision unambiguously establishes that Hendry was entitled to receive commissions only on those projects identified on his protect list at the time he received notice of termination and that resulted in "acceptable purchase orders" within the 120-day notification period. Moreover, there are no other provisions in the Rep Agreement that create any ambiguity or that call into question the obvious reading of this provision. St. Yves v. Mid State Bank, 757 P.2d 1384, 1386-87 (Wash.1988) (en banc). But see Caton v. Leach Corp., 896 F.2d 939, 944 (5th Cir.1990).[14]
 
 
 35
 The post-termination compensation provision illustrates that Hendry and Exide contracted out from under the procuring cause rule and that they did not intend Hendry to receive commissions solely as a result of his role in soliciting or procuring UPS contracts. Rather, they contemplated that Exide's receipt of acceptable purchase orders would trigger Hendry's entitlement and that absent this, Hendry would not receive commissions.[15]
 
 
 36
 We conclude that the district court erred in instructing the jury that Exide had an implied duty of good faith in terminating Hendry because the North Carolina Supreme Court's recent decision in Amos makes clear that North Carolina does not recognize a separate claim for wrongful discharge in bad faith, and because the procuring cause rule does not apply on these facts since the Rep Agreement contains an express provision regarding post-termination commissions and Exide and Hendry therefore contracted out from under that rule.
 
 
 37
 REVERSED and REMANDED to the district court which shall order retrial of such of the claims for relief other than covered by our decision, which the district court determines are still viable.
 
 
 38
 HUG, Circuit Judge, dissenting.
 
 
 39
 I respectfully dissent because I conclude that the district court's implied good faith instruction was proper under North Carolina's "procuring cause rule." As the majority notes, the North Carolina Supreme Court's holding in the recent case of Amos v. Oakdale Knitting Co., No. 278A92, 1992 WL 96892 (S.Ct.N.C. May 8, 1992), left intact the procuring cause line of authority. The majority correctly states the controlling principles of this line of authority. "North Carolina's procuring cause rule implies a good faith obligation in the termination of agency agreements, specifically in real estate listing agreements.... Courts have construed this good faith obligation as prohibiting a principal from terminating the agency in order to avoid paying the agent a commission." (Majority Opinion p. 15).
 
 
 40
 The Amos case deals with the termination of at-will employees who were being paid hourly wages. There is no issue in this type of case of the amount of compensation due for services rendered--instead, the issue is the duration of continued employment. In the "procuring cause" cases, the issue is whether the principal is terminating an agency agreement in bad faith to deprive the agent of his fair commission. That is the issue faced in this case. Hendry was a sales agent, not an employee earning wages, and the issue is whether Exide, in bad faith, maneuvered the termination of the agency agreement and ultimate sales-Hendry procured so as to deprive Hendry of his commission. The district court instructed the jury in virtually the exact words of the North Carolina decision in Jaudon v. Swink, 276 S.E.2d 511 (N.C.Ct.App.1981), which was applying prior North Carolina Supreme Court authority on procuring cause.
 
 
 41
 The majority, however, believes this was error because the parties had expressly contracted out from under the rule. The contract did provide for commissions to be paid on all acceptable purchase orders received within 120 days of termination. This, however, does not contract out from under the rule. It merely advances by 120 days the maneuvering time for Exide to delay sales that Henry had procured. Whether Exide did so was a question of fact properly submitted to the jury.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Hendry's second amended complaint alleged: (1) breach of written sales representative contract; (2) breach of an oral agreement; (3) breach of the implied covenant of good faith and fair dealing; (4) fraud; and, (5) services rendered--quantum meruit
 
 
 [2]
 Synergy began acting as Exide's sales representative in 1985, a relationship that continued until Exide terminated Synergy on March 2, 1987. In February 1985 Exide and Hendry entered into a representative agreement for fiscal year 1985 that appears to have contained largely similar provisions to the written agreement at issue in this case. Although that agreement automatically expired on September 30, 1985, thereafter Hendry continued to represent Exide without a written contract in effect until December 1986
 
 
 [3]
 This section stated that "[t]his Agreement may be terminated without cause prior to the expiration hereof by either party upon 120 days written notice...." Rep Agreement at p I(2). Other provisions relating to termination provided that "[n]o termination shall relieve either party of any obligation it may have to the other party hereto incurred under this agreement prior to the effective date of termination;" id. at p I(8), and that "in no event shall the termination notice required to be given be less than the minimum written notice permitted by law." Id. at p I(5)
 
 
 [4]
 The majority of this appeal (and the case below) focuses on Hendry's entitlement to commissions under the ALC contract and $14.8 of the $14.9 million judgment in the district court awarded as to that contract
 
 
 [5]
 This alleged breach related to GTE's award of a contract for purchase of Exide UPS products to Engineering Data Environments ("EDE"). In March 1986 Hendry began soliciting GTE Government Systems and eventually requested a bid from Exide's domestic sales division with regard to a potential GTE sale. EDE, however, also had solicited a bid on the same project but from Exide's international division (since the GTE purchase was destined for overseas). EDE received a lower quotation, GTE awarded it the contract, and Exide paid EDE the commission. Hendry claimed a right to the commission because he allegedly had an exclusive right to sell in the territory and because Exide's providing EDE with a lower quotation was a breach of the implied covenant of good faith in the Rep Agreement since Hendry had persuaded GTE to specify Exide products, the lower bid violated Exide policy, and because Exide sought to conceal it
 
 
 [6]
 Hendry claimed a right to commissions for all OEM sales made in his territory from February 1985 through July 1987. Exide apparently handled these sales directly but, in order to prevent direct sales rep competition, paid them 20% of normal commissions on OEM sales in their territory. Exide claims that Hendry presented no evidence of any such sales, but only the conclusory testimony of an expert regarding their amount. Hendry argues that the jury award was proper
 
 
 [7]
 Although Exide argues that the Supreme Court's recent affirmation of the general rule in City of Columbia calls into question the continued validity of this Circuit's exception to the general rule, we have been aware that this exception is contrary to Supreme Court precedent since well before City of Columbia. Syufy Enterprises v. American Multicinema, 793 F.2d 990 (9th Cir.1986), cert. denied, 479 U.S. 1034 (1987); Kern, 899 F.2d at 777 n. 2. Despite criticism, we continue to apply the exception. Id. at 782, 789-92 (Kozinski, J., dissenting)
 
 
 [8]
 The district court instructed the jury with regard to implied good faith as follows:
 If a manufacturer offers to pay a commission to its representative if the representative accomplishes a specified result, the representative is entitled to commission if the manufacturer revokes the offer in order to avoid paying the commission and the result is thereafter accomplished as a proximate result of the representative's efforts.
 The Representative Agreement provided that Exide could terminate the contract without cause. Such termination, however, is subject to a legal requirement of good faith. Good faith means an honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with the absence of all information, notice, benefit or belief which could render the transaction unconscientious.
 Therefore, a manufacturer cannot ignore the efforts of his representative and escape liability for commissions by terminating a representative for the purpose of avoiding such commissions.
 Appellant's Excerpts of Record (ER) Tab I, at 4093.
 
 
 [9]
 The Coman court approved and adopted language from Sides v. Duke University, 328 S.E.2d 818 (N.C.Ct.App.1985) and stated that:
 while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very mature is designed to discourage and prevent.
 Coman, 381 S.E.2d at 447 (citing Sides, 328 S.E.2d at 826).
 
 
 [10]
 Compare Intrube v. Wandel & Goltermann Techs., 774 F.Supp. 959, 963 (M.D.N.C.1991) (Coman dictum as articulating a bad faith exception to at-will discharge); Harrison v. Edison Bros. Apparel Stores, Inc., 924 F.2d 530, 933 (4th Cir.1991) (same); Mayse v. Protective Agency, Inc., 772 F.Supp. 267, 275-76 (W.D.N.C.1991) (same) and Salt v. Applied Analytical, 412 S.E.2d 97 (N.C.Ct.App.1991) (Coman did not create an independent tort claim for bad faith discharge), review denied, 415 S.E.2d 200 (1992); English v. General Elec. Co., 765 F.Supp. 293, 295-96 (E.D.N.C.1991) (same); Percell v. IBM, Inc., 765 F.Supp. 297, 302 (E.D.N.C.1991) (same); see also McLaughlin v. Barclay's American Corp., 382 S.E.2d 836 (N.C.Ct.App.) (Coman bad faith discussion not merely dictum established tort for bad faith discharge), review denied, 385 S.E.2d 498 (1989); Riley v. Dow Corning Corp., 767 F.Supp. 735 (M.D.N.C.1991) (same)
 
 
 [11]
 In instructing the jury, Judge Weigel apparently relied on a line of North Carolina cases involving the procuring cause rule as well as on section 454 of the Restatement (Second) of Agency. Section 454, entitled "Revocation in Bad Faith of Offer of Compensation," provides that:
 An agent to whom the principal has made a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, in order to avoid payment of it, revokes the offer and thereafter the result is accomplished as the result of the agent's prior efforts.
 Restatement (Second) of Agency § 454, at 370.
 Judge Weigel particularly cited comment a to that section which provides in part that "specific reparation is afforded the agent by disregarding the revocation and determining his right to the promised compensation as though no revocation had been made." Id. at comment a.
 
 
 [12]
 An agent is the "procuring cause" where he is "a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime objective ... the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms." Realty Agency, 162 S.E.2d at 489
 
 
 [13]
 We disagree with the dissent for a number of reasons. First, our reading of the procuring cause rule is that it only implies a requirement of good faith in termination if the parties' contract fails to specify when the agent is entitled to receive commissions. In the absence of such a provision, the rule attributes the employer a duty of good faith in terminating the agent. Significantly, when the duty of good faith is implied, it is only implied to the limited extent that it supplies the missing contractual term regarding when the agent is authorized to receive commissions thus requiring the employer to pay him commissions on projects for which he was the "procuring cause." If the parties do contract regarding commissions, the rule simply does not apply
 Second, we disagree that, because Hendry was a commissioned sales agent rather than an employee earning an hourly wage, the procuring cause cases rather than Amos and those decisions regarding discharge of at-will employees, are more pertinent to this case. As a general matter, we believe that courts, if anything, would be more solicitous of protecting at-will employees from bad faith discharge than they would be inclined to shield agents or independent contractors from such conduct. See Henry H. Perritt, Jr., Employee Dismissal Law and Practice § 7.2, at 63-64 (3d ed. 1992). Thus, we doubt that the North Carolina Supreme Court would extend protection against bad faith terminations to agents or independent contractors by way of the procuring cause rule when in Amos that same court declined to imply a covenant prohibiting bad faith terminations of employees.
 Finally, even assuming arguendo that the procuring cause rule applies to a termination scheme like that alleged in this case, the fact remains that Judge Weigel's instruction regarding good faith did not properly state the rule. The instruction regarding the procuring cause rule and good faith in termination, which indeed mimics the language of Jaudon v. Swink, 276 S.E.2d 511, 512-13 (N.C.Ct.App.1981), failed to include the part of that rule which states that the parties may contract out of that rule. Therefore, even if the procuring cause rule applied to the circumstances of this case and acknowledging that the good faith issue was for the jury to decide, there remains a question whether the jury properly had been instructed that the parties could "contract out" of the procuring cause rule--might it have concluded that Hendry and Exide had done so and that the procuring cause rule, in fact, did not preclude Hendry's termination in bad faith?
 
 
 [14]
 The Caton court, interpreting a representative agreement under tenants of California contract law comparable to those employed by North Carolina courts, found the contract ambiguous because, although the provision regarding post-termination commission on orders "accepted" before termination was not ambiguous a separate provision of the contract suggested, contrary to the plain meaning of the post-termination provision, that the representative was to acquire rights to an allocated portion of commissions upon his mere performance of certain duties. Id
 
 
 [15]
 Hendry urges that, within the context of large-scale military procurements, the Air Force's formal ALC solicitation (issued on March 12, 1987) was the equivalent of an acceptable "purchase order" delivered within the Rep Agreement's 120-day notice period and that Exide, by submitting a bid in response to that solicitation, "accepted" the order. This argument is without merit because the solicitation cannot reasonably be construed as a "purchase order."
 The Air Force solicitation, on its face, was an invitation to submit offers to the Air Force for a five year requirements project and, as such, it directed that "[a]ll responsible sources may submit an offer which shall be considered." Only a strained and unreasonable reading possibly could find that the language of this one paragraph document constituted a $621 million purchase order directed to Exide. Nor was the ALC contract an "acceptable purchase order." Once consummated that contract merely provided that, if and when the Air Force required UPS products, it was required to order them from Exide and that Exide must offer them for sale at the prices in the ALC contract as agreed upon by the parties and did not constitute an actual order for any particular UPS products.
 The best evidence that the ALC solicitation was not a "purchase order," however, is the plain language of another document involved in the ALC contract, entitled an "Order for Supplies and Services." As Hendry himself admits, after the ALC contract was executed it fully was automated in that no further Exide sales effort or negotiation was required. The Air Force would simply submit an "Order for Supplies and Services" to Exide and Exide would then fill the order and be paid the price provided in the contract. What Hendry neglected to note is that the "Order for Supplies or Services" form, despite its title, clearly pronounces itself to be a "purchase order." This fact is evidenced by the language set out at the middle portion of that document which reads: "ACCEPTANCE: The contractor [Exide] hereby accepts the offer represented by the [illegible word] ... purchase order as it may previously have been or is now modified. Subject to all the terms and conditions set forth and agrees to perform the same."